**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| TIGER SUPPLIES INC D/B/A ALPINE INDUSTRIES, INC., | CIVIL ACTION |
| *Plaintiff*, | NO.: 20-15566 |
| v. | |
| MAV ASSOCIATES LLC, *ET. AL.* | |
| *Defendants*. | |

## **ORDER**

On this _____ day of _____, it is hereby ORDERED that a hearing shall be held on _____, 2022 in Courtroom _____ wherein Plaintiff's counsel shall present sworn testimony about and concerning exactly what evidence it had or has to support Plaintiff's Amended filing with this Court (at the time of filing and through the present).

Defendants having filed a Rule-11 Motion (and related requests for sanctions) asserting that Plaintiff's Amended Complaint, a signed pleading from representative counsel, is without adequate factual or legal basis: Defendants seek financial sanctions in the form reimbursement for all legal fees expended defending frivolous claims and for matters related to this Motion against Plaintiff and/or its law firm for pursuing claims without factual or legal merit, admonishment and dismissal of Plaintiff's Amended Complaint with prejudice. Counsel for all Parties should be prepared to present argument on whether sanctions are warranted; and if so, the extent of such sanctions.

_____
The Hon., Stanley R. Chesler, U.S.D.J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

---

TIGER SUPPLIES INC D/B/A ALPINE
INDUSTRIES, INC.,

        *Plaintiff*,

    v.

MAV ASSOCIATES LLC,
AND MICHAEL DEL TITO,

        *Defendants*.

CIVIL ACTION

NO.: 20-15566

---

**MOTION FOR SANCTIONS**
**PURSUANT TO FED.R.CIV.P. 11**

    MAV Associates, LLC, and Michael Del Tito (collectively "Defendants"), by and through their undersigned counsel, hereby bring this Motion pursuant to Rule 11 of the Federal Rules, 28 U.S.C. § 1927 and this Court's inherent authority.

    1.    Plaintiff filed a Complaint in the Superior Court of New Jersey on or about September 22, 2020.

    2.    On November 5, 2020, Defendants removed the case on the basis of diversity of citizenship to the United States District Court for the District of New Jersey.

    3.    On November 30, 2020, Plaintiff filed an Amended Complaint with twelve (12) different causes of action.

    4.    Without any information, factual basis, legal basis, or good faith belief, Plaintiff essentially filed as many state law clams, sounding in breach of contract, trade secret violations/breach of confidential information, they could muster up against the named Defendants, as the business relationship between the Parties had soured and they were intent on refusing to pay

1

lawfully owed commissions, and using this civil lawsuit as a basis to deter Defendants from furthering its own well-established business relationships or seeking its unpaid commissions.

5.      Plaintiff admitted in sworn Interrogatories and deposition testimony that it had no information to support these claims, and through this day Plaintiff (more than a year after the initiation of a lawsuit) has still failed to present any evidence that it had a factual or legal basis to proceed with these claims as there is ZERO evidence Defendants engaged in any of the conduct complained of.

6.      Defendants outline in their Memorandum of Law (attached hereto and incorporated herein by reference) Plaintiff's utter lack of factual or legal foundation for its Amended Complaint and admissions as to same through discovery.  Defendants have provided Plaintiff with this exact motion as required by Rule 11 and a 21-day safe harbor period, but Plaintiff has failed to inform Defendants it would withdraw any or all claims.

7.      Pursuant to the "safe harbor" provisions of Rule 11, on November 17, 2021, Defendants served the instant Motion on Plaintiff, with the accompanying statement of material and undisputed facts and all exhibits in support thereof.

8.      By way of correspondence dated December 7, 2021, Plaintiff agreed that three (3) Counts in the Amended Complaint must be withdrawn, including Counts 3, 4 and 7. *See* Exhibit SS.  Therein, Plaintiff declined to identify what basis it had to pursue those claims in the first instance, but still wants their dismissal without any award of costs or fees.  *Id.*

9.      In their letter of December 7, 2021 Plaintiff still declines to withdraw the remaining Counts:  Count 1 (Breach of Contract), Count II (Breach of Implied Covenant of Good Faith & Fair Dealing), Count 5 (Tortious Interference with Prospective Business Advantage), Count 6 (Unfair Competition), Count 8 (injunction - <u>not a legal claim</u>); Count 9 (Breach of Fiduciary Duty);

Count 10 (Breach of Faithless Servant Doctrine); Count 11 (Declaratory Judgment - <u>not a legal claim</u>); and Count 12 ( Violation of "Lanham Act").  *Id.*

10.     Defendants acknowledged Plaintiff's intention to withdraw Counts 3, 4, and 7, but expressed concern respecting Plaintiff's failure to articulate why it had a basis to pursue those – frivolous – claims in the first instance.  Exhibit TT.  In any event, Defendants articulated why their continued refusal to withdraw their remaining claims (which all sound in the same flawed legal theory) continue to warrant the instant Motion and same would be filed forthwith.  *Id.*

**WHEREFORE**, Defendants respectfully requests: (a) admonishment of Plaintiff and/or its counsel; (b) reimbursement for all fees for time expended defending frivolous claims; and (c) dismissal of all claims in Plaintiff's Amended Complaint.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By:     <u>*/s/ Christin E. Burke*          </u>
Ari R. Karpf, Esq.
Christine E. Burke
J. Patrick Griffin
3331 Street Road
Bensalem, PA 19020

Dated:  December 10, 2021

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| TIGER SUPPLIES INC D/B/A ALPINE INDUSTRIES, INC., | CIVIL ACTION |
| *Plaintiff,* | NO.: 20-15566 |
| v. |  |
| MAV ASSOCIATES LLC, AND MICHAEL DEL TITO, |  |
| *Defendants.* |  |

**DEFENDANTS' MEMORANDUM IN SUPPORT**
**OF SANCTIONS PURSUANT TO FED.R.CIV.P. 11, 28 U.S.C. § 1927 AND THIS**
**COURT'S INHERENT AUTHORITY**

Defendants, MAV Associates LLC & Michael DelTito, by and through their undersigned counsel, file the instant memorandum in support of sanctions and states as follows:

I.    **INTRODUCTION**

Plaintiff (Tiger Supplies Inc. d/b/a Alpine Industries Inc., referred to throughout as either "Plaintiff" or simply "Alpine") initiated the above-captioned lawsuit in New Jersey Superior Court by launching eight (8) baseless claims against Defendants. After Defendants removed the case to this Honorable Court and filed a motion to dismiss, Plaintiff filed an Amended Complaint bringing the total "causes of action" to twelve (12).[1] All twelve (12) of Plaintiff's current claims relate to an alleged breach of a Sales Representative Agreement (the "Agreement") entered into by these Parties in January of 2018. As discussed in detail below, the only breach of the Agreement was Alpine's failure to pay MAV's lawfully earned commissions.

---

[1] At least two (2) of Plaintiff's Causes of Action are not recognizable legal claims but seemingly mislabeled requests for relief. *See e.g.* Plaintiff's Amended Complaint, attached as Exhibit P at ¶¶ 89-91; 104-110.

The Parties entered into a contract signed on January 23, 2018 (labeled a "Sales Representative Agreement")(*hereinafter* "the Agreement").  In essence, the Agreement provided that Defendant MAV (an independent manufacturer's representative in the Janitorial/Sanitation industry) would exert its best efforts to sell Alpine's products to janitorial dealers within a defined geographic territory.  However, the Agreement contained a <u>non-exclusivity</u> provision expressly stating that MAV would be selling *competitive products* based upon the manufacturers it represents.[2]  The evidence shows that during both 2018 and 2019, MAV sold very little of Alpine's products (which included by way of example, some hand dryers, buckets and LED signs).

However, the COVID-19 pandemic created an overwhelming demand for certain products within the janitorial/sanitation industry, including <u>hand sanitizer dispensers</u> (one of the main products at issue in this case, which Alpine did not even carry prior to the pandemic).  MAV literally sold millions of dollars' worth of Alpine's *imported* products (branded as "Alpine").  However, many other manufactures/distributors were getting these same products cheaper, and MAV was by no means an exclusive sales agent to Alpine.  MAV worked in an extremely competitive market to sell Alpine's products (though Alpine's products were back ordered for months, were arriving short, or defective and generating *numerous* customer complaints). In fact, every single "customer" at issue in this case was that of *MAVs* – which customers MAV <u>introduced to Alpine</u>.  While MAV was obligated to exert its "best efforts" to represent Alpine's products under the Agreement, it was free to sell competitive products via other manufacturers, particularly

---

[2] 13. COMPETITIVE PRODUCTS – MAV ASSOCIATES LLC HAS CREATED VERY SUCCESSFUL RELATIONSHIPS WITH THE MANUFACTURERES THAT WE REPRESENT, WE UNERSTAND THAT THERE WILL BE TIMES THAT SOME OF THESE MANUFACTURERS MAY CARRY PRODUCTS OF SIMILAR STYLE, OR BRAND.  WE WILL ALWAYS DO THE VERY BEST WE CAN TO REPRESENT YOUR PRODUCTS TO ALL OF OUR CUSTOMOER BASE.  WE WILL NOT SHARE OR DEVULGE ANY INFORMATION (PRICING, SAMPLES, LITERATURE OR PRIVELAGED COMPANY INFORMATION KNOWINGLY TO A DIRECT COMPETETER OF ALPINE INDUSTRIES, INIC. FOR ANY REASON

if those manufacturers were getting products both faster and cheaper than Alpine, and thus more able to satisfy the demands of MAV's well established customer base.

As can be gleaned from the unrefuted facts in this case, Alpine had numerous sales representees (besides MAV) selling their products. MAV was not an employee of Alpine and solely generated commissions from Alpine if it sold products (and that assumed a.) they were available for sale, and not delayed during the COVID-19 pandemic and b.) those products were not being given to other sales representatives across the United States for their own respective territories.

Though MAV generated *millions* of dollars in revenue for Alpine between March of 2020 and August of 2020, Alpine moved to sever the business relationship on September 2, 2020 – strictly because MAV was selling competitive products. It then refused to pay for any commissions MAV earned during the months of July or August 2020. Instead of paying out the $100,000.00 + in commissions *admittedly* owed to MAV – it filed a lawsuit in state court as literal leverage to i.) deter MAV from competing further with the same customer base; and ii.) stave off paying these owed commissions. What this District Court will see upon a review of the record facts, is Alpine -- through its attorneys – is using the current lawsuit as a rouse to avoid hefty commissions owed, and to satiate its utter dissatisfaction that MAV sold competitive products other than Alpine's during the height of the COVID-19 pandemic.

The *original* claims include a host of legal terms, claiming MAV "stole" "confidential" pricing information, "trade secrets," customer lists and the like. After discovery proceeded for ten (10) months, the principals involved in this case and testifying conceded the sole basis for this suit was MAV's competition with Alpine. They concede there is no evidence MAV stole *any* customer lists, sales information, nor pricing.

6

After notice and service of the instant Rule 11 Motion, Alpine agreed to withdraw three (3) Counts:  Count 3 (for violations of the New Jersey Trade Secrets Act), Count 4 (Misappropriation of Confidential Information) and Count 7 (Conversion).  Exhibit SS.  Yet, Alpine did not identify why filing these *very serious allegations and costly claims to defend* were **ever** merited and they should not be obligated to reimburse MAV & Mr. Deltito for defending baseless and wild accusations.

The claims at issue (including those withdrawn and those upon which they are still proceeding) are baseless for four (4) separate reasons.

First, the Agreement contained an explicit provision acknowledging that Defendants were not required to exclusively sell Plaintiff's products, and explicitly stated that Defendants would be representing other manufacturers who sold similar products. There can be no "breach of contract" or "*unfair* competition," tortious interference with business deanships (or any one of the related claims simply styled as a different cause of action) for engaging in activity that was contemplated and permitted by the contract itself.

Second, Plaintiff has no evidence, proof, or reasonable factual basis to allege that Defendants stole customers; their own admissions confirm without debate all of the "customers" at issue were *pre-existing* business relationships of MAVs, who it introduced to Alpine.  While they agreed to withdraw all trade secret/confidential info or conversion claims, a simple conversation with Alpine's principals would have revealed that all of the "clients" at issue in this case were MAV clients and he was kind enough to bring that book of business to Alpine for each of their mutual benefit.  An up-front conversation would have also yielded that all pricing information is based upon market demands and Alpine's pricing information was all available online.  These claims should have been withdrawn long ago – when MAV filed its *first* Motion to

7

Dismiss back in Nov. 2020 – not after dragging MAV through 10 months of discovery for claims without any factual or legal support.

Finally, even if Plaintiff could somehow overcome any fatal shortcomings in their breach of contract claims, Plaintiff has no evidence, proof, or reasonable factual basis to show that Plaintiff has suffered damages in any way. Their claim for "damages," is their woefully wrong assertion they are entitled to the sales obtained by any competitors MAV sold to during the time in question, though they know full and well MAV was contractually permitted to sell similar products for competitors.

Upon presentation of the Rule 11 Motion, it appears Alpine's argument has shifted from the position it took during depositions (via its principals under oath). In depositions, they admitted they solely cried "breach" of the Agreement because was selling **any** competitive products. Because their *legal counsel* knows full and well this was something MAV was lawfully permitted to do under the Agreement (as its spelled out in black and white), they are now attempting to change their argument. Their latest argument is – yes – MAV was permitted to sell competitive products to "existing" manufacturers it did business with *only* when MAV signed the contract in January 2018. And, that when MAV started doing business with one "Organic Technologies"[3] in the Spring of 2020, that was not permitted as that business relationship did not exist as of January 2018. There is not a single provision in the Parties' Agreement in this case that would preclude or limit MAV as strictly doing business for the manufacturers he represented as of January 2018. In fact, the non-exclusivity provision at issue was mean to protect this independent sales representative's livelihood and maintain business relationships with "the manufactures we represent," meaning now or in the future – who may sell competitive products. This was confirmed

---

[3] A business engaging in imports/experts, operated by one "William Tan."

by the fact that at any given time, MAV's email signature contained upwards of 10-15 manufactures it represented (ever changing) as did its business card.  Alpine never (at the outset of the relationship or thereafter) sought to confirm who those manufacture were, t heir line of business or otherwise.   The sole reason they cared about Organic Technologies in the Summer of 2020 --- is because it was brough to their attention and it was money they otherwise felt they should be making vs. any other business in that same industry.  That doesn't mean their dissatisfaction is legally actionable.

Defendants have, and will continue to assert, that every single claim brought by Plaintiff lacks legal and factual merit. Plaintiff's "kitchen sink" Amended Complaint was filed without a shred of evidentiary support, without adequate or required due diligence by counsel and have created an ongoing hemorrhage of time expenditure(s), costs, legal fees and an undue burden upon the Defendants and this Honorable Court. Plaintiff has unfairly burdened this Honorable Court and Defendants and has attempted to improperly shift the burden of identifying any genuine claims and determining if any of those claims have legal support. Plaintiff's initiation of this lawsuit was at worst an intentional subverted attempt to avoid paying Defendants hundreds of thousands of dollars in commissions owed and payable and at best a grossly negligent misuse of the legal process.

## II.    <u>FACTUAL BACKGROUND</u>

Defendants have created a comprehensive Statement of Undisputed Material Facts, with pin point citations to the record, which they incorporate by reference the attached Statement of Undisputed Material Facts ("SUMF").

### III.  ARGUMENT

### A.    There is No Legal or Factual Basis for Any of Plaintiff's Claims

Plaintiff alleges twelve independent causes of action in its Amended Complaint. As dispensed with below in turn, there is no factual or legal basis to bring, or continue bringing, any and all of these claims.  Defendants still addresses Counts 3, 4, and 7 (though Alpine says they'll withdraw same), as those claims were never grounded in any factual support and should not have been brought in the first instance, and have caused significant legal fees to MAV & Mr. Deltito in defending same.

#### 1. Count 1 – Breach of Contract

"There are four elements to state a valid claim for breach of contract under New Jersey law: (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Hv Assocs., LLC v. PNC Bank, N.A.*, Civil Action No. 17-8128 (SRC), 2019 U.S. Dist. LEXIS 85433, at *26-27 (D.N.J. May 20, 2019) (citation omitted). Plaintiff is unable to point to any legal or factual basis to demonstrate how Defendants allegedly breached the agreement, or how Plaintiff suffered damages as a result.  Moreover, Plaintiff declined to pay over $100,000.00 in commissions lawfully owed from July through August 2021 and is in material breach of the Agreement.

Plaintiff alleges that: "MAV flagrantly breached the Agreement by, among other things, misappropriating Plaintiff's confidential information, including, but not limited to, pricing and product information." *See* Plaintiff's Amended Complaint (Exhibit P) at ¶ 25.  Plaintiff's product and pricing information is in the public domain, is not confidential, and therefore Defendants could not have "misappropriate[d] Plaintiff's confidential information." Any claim that Defendants

breached the agreement by "operating a competing business" is equally without merit. The Agreement between Plaintiff and Defendants **did not require exclusivity**. To the contrary, the Agreement expressly contemplated that Defendants would in fact would continue its work with competitors. Exhibit F, which states in pertinent part as follows:

> 13. COMPETITIVE PRODUCTS – MAV ASSOCIATES LLC HAS CREATED VERY SUCCESSFUL RELATIONSHIPS WITH THE MANUFACTURERES THAT WE REPRESENT, WE UNERSTAND THAT THERE WILL BE TIMES THAT SOME OF THESE MANUFACTURERS MAY CARRY PRODUCTS OF SIMILAR STYLE, OR BRAND. WE WILL ALWAYS DO THE VERY BEST WE CAN TO REPRESENT YOUR PRODUCTS TO ALL OF OUR CUSTOMOER BASE. WE WILL NOT SHARE OR DEVULGE ANY INFORMATION (PRICING, SAMPLES, LITERATURE OR PRIVELAGED COMPANY INFORMATION KNOWINGLY TO A DIRECT COMPETITOR OF ALPINE INDUSTRIES, INIC. FOR ANY REASON

At all times, Alpine admits that MAV preformed under the contract generating *significant sales*. In fact, MAV was one of, if not *the* best sales agent for Alpine during the period in question. Pl. SOF at ¶¶ 42-44. Moreover, as set forth in MAV's Counter Statement of Material and Non-Disputed Facts, Alpine was experiencing significant delays in providing product, quality issues with the product that was delivered, shortages in quantity promised – and the like. *Id.* at 47-63. The customer complaints were both frequent and prevalent and the to the point where MAV's customers were threatening to sever their relationship with MAV due to Alpine's failures. *Id.*

Alpine knows full and well what a non-exclusivity provision is – and what it would mean if same was lacking. Alpine turned over its sales representative agreements with its <u>other</u> independent sales reps over the years – and in those agreements, which are all unique, Alpine negotiated for a non-exclusivity provision (which is ***sorely lacking in the Agreement with MAV***). *See e.g.* Exhibit RR. Alpine is and was a sophisticated manufacture & distributor with longstanding contractual engagements with its independent sales representatives. IF it sought any type of exclusivity or restrictions upon MAV's ability to sell competitive products, it should have included a non-exclusivity provision as it had done in the past with other sales agents. It did not.

Instead, MAV negotiated for and included – a provision identifying that MAV could and would sell competitive products for the manufacturers it represents. This included Organic Technologies.

Non-exclusivity, by definition, allows for a party to enter into agreements with other Parties which may compete with the business interest of the adverse party. *See e.g. Capital Health Sys., Inc. v. Horizon Healthcare Servs., Inc.*, 446 N.J. Super. 96, 103, 140 A.3d 598, 602 (Super. Ct. App. Div. 2016)(trial court's discovery ruling rev'd on other grounds) (Network Agreement is "non-exclusive" and therefore does not prohibit the parties from entering into contracts with other hospitals; "the non-exclusivity provisions of Section 7.5 of the Agreements also gave Horizon the opportunity to enter into new contracts with other hospitals, including competitors of St. Peter's and Capital"); *City of Jersey City v. Liberty Storage, Ltd. Liab. Co.*, No. A-4111-09T2, 2011 N.J. Super. Unpub. LEXIS 134, at *1 (Super. Ct. App. Div. Jan. 20, 2011)(contained a non-exclusivity clause that permitted Liberty to find its own purchaser and list the property with other brokers); *TL of Fla., Inc. v. Terex Corp.*, No. 13-2009-LPS, 2016 U.S. Dist. LEXIS 150136, at *23 (D. Del. Oct. 25, 2016)(the purpose of the non-exclusivity agreement was to account for the existence of another dealer operating in the same territory).

Another District Court in this Circuit addressed an extremely similar case, whereby the Parties expressly agreed to a non-exclusivity provision. A distributorship agreement entered into between the plaintiff Kennametal and Defendant SEC outlined that Defendant SEC would be a distributor of Kennametal products, specifically certain mining equipment and replacement cutters. Kennametal, Inc. v. Subterranean Equip. Co., 543 F. Supp. 437, 438 (W.D. Pa. 1982). Ultimately, during the course of the relationship, Defendant SEC began directly selling cutters to SEC's customers at a discount price. *Id.* Kennametal pursued claims for breach of contract, and tortious interference with contractual relations. *Id.* In granting summary judgment on these

claims, relying on the fact that the Agreement had a non-exclusivity provision, the Court articulated as follows:

> After reviewing the distributorship agreement which outlines the relationship between the two parties, the Court is at a loss to find any term or condition that prohibits Kennametal from entering the marketplace to sell its products. The Court agrees with Kennametal's plain reading of the agreement and finds that the language of the agreement allows Kennametal to compete with SEC and properly sell its products in the open market. Interference in this fashion is not improper as it is made specifically permissible under the terms of the agreement. Kennametal is justified under the terms of the contract in choosing to directly sell its products to SEC's customers or any other class of potential buyers and may induce such sales by offering a discount price.

> It is true that the interests of the two companies may conflict when competing for sales to the same customers, but this conflict does not require Kennametal or SEC to forego their legitimate right to sell merchandise to customers who are financially able and willing to purchase items for sale. The business arena is a competitive one that requires its players to have considerable skill, foresight and endurance. The successful players gain their competitive advantage by knowing how to employ the rules of the game for their economic benefit

> The Court finds Kennametal's conduct to be proper and within the realm of acceptable business behavior where the distributorship agreement expressly appointed SEC a non-exclusive distributor and did not restrict the rights of Kennametal to compete in the marketplace.

*Kennametal, Inc. v. Subterranean Equip. Co.,* 543 F. Supp. 437, 439-40 (W.D. Pa. 1982).

Alpine asks this Court to accept a *perverse* reading of the Agreement here: that MAV was free to sell any and all competing products with any number of manufactures it may have represented as of January 2018, but it somehow frustrated the intent of the contract if MAV did the same thing, and represented similar products for Organic Technologies. This is not a plain reading of the contract, nor one any reasonable juror would be permitted to accept.

Because MAV had a non-exclusivity provision, he was free to sell like products for other manufactures he represented during the course of the Agreement. While Alpine ultimately changed their position and decided they did not want him selling competing or similar products,

their dissatisfaction does not give rise to a breach of contract action.  This claim is not legally nor factually supported.

        <u>2. Count 2 - Breach of Implied Covenant of Good Faith and Fair Dealing</u>

[E]very contract in New Jersey contains an implied covenant of good faith and fair dealing." *Sons of Thunder*, *supra*, 148 N.J. at 420, 690 A.2d 575. Our Supreme Court has stated that "[i]n every contract there is an implied covenant that 'neither party shall do anything which will have the effect of destroying or injuring **the right of the other party** to receive the fruits of the contract; in other words, in every contract there exists an implied covenant of good faith and fair dealing.'" *Palisades Properties Inc. v. Brunetti*, 44 N.J. 117, 130, 207 A.2d 522 (1965) quoting 5 *Williston on Contracts,* § 670, pp. 159-60 (3d ed.1961). *See also Wilson v. Amerada Hess Corporation*, 168 N.J. 236, 773 A.2d 1121 (2001).

These principals, however, do not mean to expand a Parties' rights under a contract or confer upon Alpine in this case a benefit far greater than it would derive – including if it had negotiated a non-exclusivity provision in this case.  Imposing heightened contractual obligations upon an *independent* sales agent, whose incomes depends upon his ability to sell products for *varying manufactures who may compete from time to time*, is not any type of relief Alpine is entitled to under our New Jersey common law.

Our New Jersey Supreme Court explained:

What constitutes good faith performance and fair dealing has been the subject of considerable analysis. For transactions involving merchants and the sale of goods, the Uniform Commercial Code has defined good faith as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." *N.J.S.A.* 12A:2-103(1)(b). The Restatement (Second) of Contracts notes that every contract imposes on each party a duty of good faith and fair dealing in its performance and enforcement. *Restatement (Second) of Contracts* § 205 (1981). A comment to the Restatement states that "[g]ood faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a

variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness." *Restatement (Second) of Contracts* § 205 comment a (1981).

*Wilson*, *supra*, 168 N.J. at 245, 773 A.2d 1121. Nothing MAV did, in acting in accord with his non-exclusivity provision was out of line with industry standards. Competition is competition; doing so does not equate to bad faith, nor "unfair competition," as that term is legally defined. Troubling, but in line with their actions in this case, Alpine loosely claims that there was some form of bad faith here because MAV did not alert Alpine to the fact that Organic Technologies was purchasing products from the same manufacture as Alpine. Exhibit SS. MAV (Mr. DelTito) was not an employee, CEO or otherwise for Alpine. It was not his job to subvert any potential competitors of Alpines. In fact, his Agreement contemplated that he would, in fact, be doing business with manufacturers selling competing products.

Here the evidentiary record is clear. MAV preformed under the express terms of the Agreement. Nothing MAV did destroyed or injured the rights of Alpine *as set forth* under the contract. The Parties were not in an exclusive relationship such that MAV could only sell Alpine's products. MAV made every effort to promote Alpine's products, even after Alpine could not fulfill existing orders, was unable to accept new orders, and was souring MAV's existing business relationships. MAV's sales record speaks for itself. The fact that Alpine *could* have made more money in general if MAV had been exclusive is the real issue – but they were not, and Alpine clearly contemplated at the outset of entering this Agreement they may loose sales to competing products being marketed to MAV's other manufactures.

<u>3. Count 3 - Violation of the New Jersey Trade Secrets Act</u>

The definition of "trade secret" under the Trade Secrets Act includes information which "(1) Derives independent economic value, actual or potential, from not being generally known to,

and ***not being readily ascertainable*** by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of ***efforts*** that are reasonable under the circumstances ***to maintain its secrecy***." N.J. Stat. § 56:15-2 (emphasis added). Here, Plaintiff seeks trade secret protection for "pricing and product information, samples, and advertising literature." *See* Plaintiff's Amended Complaint (Exhibit P) at ¶ 35. However, such information *is* readily ascertainable by anyone with an internet connection, and Plaintiff has made *no* efforts to maintain its secrecy. To the contrary, it is published on the internet. Catalogs are readily available to whomever wants them; any customer who asks can obtain a copy of a product specifications (or find it online) and pricing information is both set forth online and shared freely with any customer who asks.  The fact that MAV sought to sell similar products and priced them based upon *market demands* does not equate to conversion of any purported secret pricing information of Alpine.

At a more fundamental level, Plaintiff merely alleged in purely conclusory form that it allegedly made "reasonable efforts to maintain the confidentiality of its trade secrets" (*id.,* ¶38), but fails to identify *what* steps it took. *See Barth v. Vulimiri,* No. 19-20755 (RBK/JS), 2020 U.S. Dist. LEXIS 91206, at *14-16 (D.N.J. May 27, 2020) (granting motion to dismiss claim under the Trade Secrets Act, where the plaintiff did "not plead sufficiently efforts to maintain the[information at issue] as secret…. If [the defendant] had access to the [information] before the execution date of the [agreement] and there were unambiguous efforts to keep that list secret, then the Complaint does not yet allege sufficient facts to support a plausible claim of relief of trade secret theft under this statute."). However, Plaintiff conceded that Defendant had no access to wholesale pricing information or access to its systems. Further, Alpine's pricing was publicly available and the record demonstrates that as pricing was comparative in the marketplace, supply was the determinative factor when customers decided to purchase.

Under New Jersey law, Plaintiff must "establish five basic elements of the claim: (1) the existence of a trade secret, (2) communicated in confidence by the plaintiff to the employee, (3) disclosed by the employee in breach of that confidence, (4) acquired by the competitor with knowledge of the breach of confidence, and (5) used by the competitor to the detriment of the plaintiff." *Rohm & Haas Co. v. ADCO Chem. Co.*, 689 F.2d 424, 429-30 (3d Cir. 1982) (citations omitted). In the case at bar, Plaintiff lists the price of every single one of its products online to the general public. Thus, Plaintiff could not at filing, and cannot to this day, establish any of the elements under *Rohm & Haas, supra*, let alone all five. There is simply no reasonable basis in either fact or law to allege that Defendants are liable under the New Jersey Trade Secrets Act. Nor was there when they filed the claim. Yet, they seek dismissal without any award of costs or fees for pursuing vexatious and costly litigation.

Of note (which speaks to why costs should be awarded) – only after this lawsuit was filed, did Alpine *take down* its product pricing information on their site. Currently, their site contains all product SKUs and product information (dimensions, descriptions and the like). *See* https://alpineindustries.com/product/automatic-hands-free-foam-hand-sanitizer-soap-dispenser-with-floor-stand-1200-ml-white/. However, when Defendants originally filed their Motion to Dismiss on November 10, 2020, it shared with this Court pages and pages of Alpine's products containing pricing information attached as an Exhibit for this Court. (Dkt No.: 4, Exhibit C document # 3).

Even if Alpine hadn't put its pricing online (which it had) - competitors were selling dispensers holding them out as "Alpine" hand sanitizer dispensers **with the same SKU (430-FS)** or otherwise (depending on the precise product at hand) and generating a price based upon market rates. MAV did the exact same thing; it would not need Alpine's pricing information to sell the

same type of hand sanitizer dispensers everyone else was selling at a competitive rate – they were being sold all over the internet or by anyone who could import them via air or boat.

Even now, multiple sites are selling the same hand sanitizer dispensers (stand or wall mount) that Alpine was and is marketing for distributors for re-sale (the following are only examples for this Court, but there are 100's online):

- https://www.staples.com/touchless-hand-sanitizer-dispenser-with-stand-empty-f1406-s-t-s/product_24448888?ci_sku=24448888&KPID=24448888&cid=PS:GS:SBD:PLA:CB&gclid=CjwKCAiA7dKMBhBCEiwAO_crFJYuhvmtgrK6dWD7th-hiqKSlgMPQpeeCDXhXOPy3fXcVbcDN6zJ2BoCu44QAvD_BwE

- https://www.supplyworks.com/Sku/313427054/alpine-industries-1200-ml-automatic-soap-and-gel-hand-sanitizer-dispenser-in-white-with-floor-stand-810012676137-430-l-s?ef_id=CjwKCAiA7dKMBhBCEiwAO_crFArRaaCNCToLS73UOICChlKgBg0jb3nbYtTXq6cGgMPowMAl2Xo8JhoCwZ0QAvD_BwE:G:s&s_kwcid=AL!10728!3!461378319577!b!!g!!!11020661657!107765555693&gclsrc=aw.ds&gclid=CjwKCAiA7dKMBhBCEiwAO_crFArRaaCNCToLS73UOICChlKgBg0jb3nbYtTXq6cGgMPowMAl2Xo8JhoCwZ0QAvD_BwE

- https://www.officesupply.com/cleaning-breakroom/cleaning-janitorial-supplies/hand-skin-care/hand-sanitizer-dispensers/alpine-liquid-hand-sanitizer-soap-dispenser-white/p961277.html?ref=pla&utm_source=google&utm_medium=cpc&adpos=&scid=scplp961277&sc_intid=961277&gclid=CjwKCAiA7dKMBhBCEiwAO_crF

I29Y7pE_8QL6nkvDSyHzoCr8sz3TEMlWGNBd9e-Ce6FxXmPYwOM2xoC49IQAvD_BwE

- https://www.amazon.com/Alpine-Industries-Automatic-Hands-Free-Dispenser/dp/B086MCJWGZ/ref=asc_df_B086MCJWGZ/?tag=hyprod-20&linkCode=df0&hvadid=459703743744&hvpos=&hvnetw=g&hvrand=4644902532042018853&hvpone=&hvptwo=&hvqmt=&hvdev=c&hvdvcmdl=&hvlocint=&hvlocphy=9003840&hvtargid=pla-947796059255&psc=1

In sum, there was <u>no trade secreted information</u> that MAV was ever privy to during its entire relationship with MAV, and certainly not during the 2020 time frame when Alpine was selling generic hand sanitizer dispensers that other manufactures, including Organic Technologies, were importing from China as well.

<u>4. Count 4 - Misappropriation of Confidential Information</u>

Every single one of Plaintiff's causes of action are premised upon the allegation that Defendants "misappropriate[d] its confidential information." *See* Plaintiff's Amended Complaint (Exhibit P) at ¶¶ 25; 31; 39; 51; 59; 65; 68; and 75. There was never any factual basis that Plaintiff's pricing or client information was "confidential information."

In determining whether a party has misappropriated allegedly confidential information, "[a] court may look to whether the information is public…." *Torsiello v. Strobeck*, 955 F. Supp. 2d 300, 314 (D.N.J. 2013). "[I]t is difficult to se[e] how information can be deemed 'confidential' if it is readily available in the public domain (via public records, Internet postings or first-hand observation)." *Kuhns v. City of Allentown*, 264 F.R.D. 223, 230 (E.D. Pa. 2010). In denying a request for a preliminary injunction, it has been held:

> The Court does not find that Mega has any legal basis upon which to argue that Defendants misappropriated Mega's trade secrets by selling to the same customers

as Mega. The retailers who sell the items at issue are well-known and are all in the public domain. While Mega argues that manufacturing sources, or suppliers, are confidential, Defendants have certified that such information is easily obtained through websites such as Google and Alibaba.com.

*Mega Brands America, Inc. v. Cerillo,* 2014 N.J. Super. Unpub. LEXIS 2990, *29-31 (Law Div. Dec. 3, 2014).

The Court in *Mega Brand, supra,* also dismissed the plaintiff's misappropriation of confidential information claim, as the alleged confidential information in that case, much like Plaintiff's pricing information here:

> is susceptible to reverse engineering (i.e., the process of working backward) and thus is not considered a trade secret. *Hammock by Hammock v. Hoffmann-LaRoche, Inc.*, 142 N.J. 356, 662 A.2d 546 (1995). Along the same lines, ***a marketing concept has been held to be not a trade secret***, as "it does not by confidentiality create a continuing competitive advantage because once it is implemented it is ***exposed for the world to see and for competitors to legally imitate***." *Johnson v. Benjamin Moore & Co.*, 347 N.J. Super. 71, 96-97, 788 A.2d 906 (App. Div. 2002) (emphasis added).

*Mega Brands America, Inc., supra,* *34-35 (emphasis added). *See also Arkeyo, LLC v. Cummins Allison Corp.*, 342 F. Supp. 3d 622, 632 (E.D. Pa. 2017) (any information that has been made publicly available is "incapable" of being confidential or a trade secret); *Events Media Network, Inc. v. Weather Channel Interactive, Inc.*, 2015 U.S. Dist. LEXIS 12497, at *40 (D.N.J. 2015) (dismissing all claims against a plaintiff for breach of confidentiality when such information was already in the public domain); *Haywood v. Univ. of Pittsburgh,* 976 F. Supp. 2d 606, 645 (W.D. Pa. 2013) (refusing to find that corporate financial data taken was confidential because it was in the public domain); *Graff v. Haverhill N. Coke Co.,* 2014 U.S. Dist. LEXIS 13180, at *11 (S.D. Ohio 2014) (refusing to find "confidential" information that is publicly available and expressing concerns of the business misunderstanding of what information is "confidential."); *Baxter Int'l, Inc. v.*

*Cobe Labs., Inc*., 88 F.3d 1054, 1058 (Fed. Cir. 1996) (dismissing claims of breach of confidentiality and patent infringement as the same information was in the public domain).

Here, Alpine's sole contention was that Defendants misappropriated Plaintiff's pricing information. Initially, Alpine's pricing information was publicly available on their own website. Alpine concedes that Defendants had no access to internal price lists, internal systems, or supplier information. In fact, pricing was determined by market conditions and all distributors, including Plaintiff and Defendants were forced to sell products at market prices. Plaintiff also concedes that product availability, not pricing, was customers' main concern when choosing what company to purchase products from. Finally, and perhaps most tellingly, even if Plaintiff's pricing information was confidential, Plaintiff concedes that there is absolutely no evidence that Defendants "misappropriated" any pricing information and that it's a mere "assumption."

### 5. Count 5 - Tortious Interference

Plaintiff brings Count 5 for tortious interference with business relations and prospective economic advantage.In New Jersey, the tort of interference with a business relation or contract contains four elements: (1) a protected interest; (2) malice—that is, defendant's intentional interference without justification; (3) a reasonable likelihood that the interference caused the loss of the prospective gain; and (4) resulting damages." *DiMaria Constr., Inc. v. Interarch*, 351 N.J. Super. 558, 567, 799 A.2d 555 (App. Div. 2001), aff'd o.b., 172 N.J. 182, 797 A.2d 137 (2002).

The elements for a claim of tortious interference with prospective economic advantage are:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

> (b) preventing the other from acquiring or continuing the prospective relation.

*Orchards at Bartley Assisted Living v. Schleck*, No. A-3481-17T1, 2019 N.J. Super. Unpub. LEXIS 564, at *8 (App. Div. Mar. 13, 2019) (citing *Nostrame*, 213 N.J. at 122 (quoting Restatement (Second) of Torts § 766B (Am. Law Inst. 1979)).]

Initially, Count Five fails because it is based upon the unfounded allegation that Defendants misappropriated confidential information, which as discussed *supra*, was not confidential. The claim also is meritless because neither the Amended Complaint, nor evidentiary record did not identify a single existing or prospective economic relationship that it supposedly lost. In fact, Defendants sold products to customers that *Defendants had existing relationships with prior to entering into the Agreement with Plaintiff*. At no time did Plaintiff provide Defendants with any kind of customer list. Further, at the height of this pandemic, Defendants began selling comparable products to its own customer base only after the record irrefutably showed these same customers were unhappy with Alpine, Alpine couldn't fulfil orders, couldn't respond to customer demands and had "junk" product. Finally, there is no evidentiary record that demonstrates that Plaintiffs lost any customers or sales as a result of Defendants' actions. This claim is based entirely on speculation and conjecture and therefore there is no factual basis to file this claim, or continue with its prosecution.

### 6. Count 6 – Unfair Competition

"The doctrine of unfair competition traditionally has been interpreted by courts in accordance with common law principles. Understandably, because the common law of unfair competition has evolved unevenly over the years, judicial applications in this tort field have not always been uniform or fixed." *Columbia Broadcasting System, Inc. v. Melody Recordings, Inc.*,

134 N.J. Super. 368, 375-376 (App. Div. 1975) (citing *Squeezit Corp. v. Plastic Dispensers*, 31 N.J. Super. 217, 221 (App. Div. 1954); Ellis, Trade Secrets § 9 (1953)). "The judicial goal should be to discourage, or prohibit the use of misleading or deceptive practices which renders competition unfair. The law must be sufficiently flexible to accommodate those goals." *Ryan v. Carmona Bolen Home for Funerals*, 341 N.J. Super. 87, 92 (App. Div. 2001). The gist of an action for unfair competition is "fair play". *See Ryan v. Carmona Bolen Home for Funerals*, 341 N.J. Super. 87 (App. Div. 2001).

Again, Plaintiff has no factual or legal basis to bring or pursue this claim.

Defendants performed under the express terms of the Agreement which stated that Defendants would exhibit their best efforts, but  would be selling similar products <u>to Plaintiff's competitors</u>.

### 7. Count 7 – Conversion

Count seven has no basis in fact or law and is borderline nonsensical. "[C]onversion is the intentional exercise of dominion and control over chattel that seriously interferes with the right of another to control that chattel. *Meisels v. Fox Rothschild LLP*, 240 N.J. 286, 305 (2020). It is unclear what Plaintiff is claiming, but seems to suggest that Defendants somehow converted Plaintiff's "Confidential Information." First Plaintiff's pricing is not confidential. Second, even if said information was confidential, it is a legal impossibility that Defendant could exercise control over non-tangible information. There is no simply no allegation, evidence, or legal basis to establish a claim for conversion.

### 8. Count 8 – Permanent Injunction

Count eight is not a cause of action but rather a request for relief.

### 9. Count 9 – Breach of Fiduciary Duty

In order to state a claim for breach of fiduciary duty, a plaintiff must allege: (1) the existence of a fiduciary relationship, (2) a breach of the duty imposed by that relationship, and (3) harm to the plaintiff. *McMullen v. Ocwen Loan Servicing*, LLC, 2017 WL 714347, at *4 (D.N.J. 2017) (citing F.*G. v. MacDonell*, 150 N.J. 550, 561–64, 696 A.2d 697 (1997)) (other citation omitted). Here, there is no legal or factual basis to establish that (a) a fiduciary relationship existed and (b) that even if there was, there was no breach of the duty imposed by that relationship. Plaintiff alleges that Defendant (i) stole Plaintiff's confidential information, (ii) that Defendant directly competed with Plaintiff, and (iii) that Defendant stole Plaintiff's customers and diverted its customers to purchase directly from Defendants. First, as discussed *ad nauseum* Plaintiff's pricing information was not confidential and was publicly available to anyone with an internet connection. Second, the express terms of the Agreement allowed Defendant to sell competing products. Third, there is no evidentiary or legal basis to claim that Defendants "stole" any of Plaintiff's customers. Therefore there is no evidentiary or factual basis to prosecute this claim.

### 10. Count 10 – Breach of Faithless Servant Doctrine

Count 10 has no basis in fact or law as Defendants are not alleged or otherwise employees of Plaintiff. "In assessing a claim that a former employee was a faithless servant, our courts apply a breach of loyalty analysis." *All Granite & Marble Corp. v. Deja*, No. A-1071-18T1, 2019 N.J. Super. Unpub. LEXIS 2636, at *9 (App. Div. Dec. 24, 2019) (citing Kaye, 223 N.J. at 228-29 (finding a former employee was an unfaithful servant by breaching the duty of loyalty owed to his employer). "Loyalty from an employee to an employer consists of certain very basic and common-sense obligations. An employee must not while employed act contrary to the employer's interest." *Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 302, 770 A.2d 1158 (2001) (citing *Chernow v. Reyes*, 239 N.J. Super. 201, 204, 570 A.2d 1282 (App. Div. 1990)) (emphasis added). Here, even

24

if Defendants were employees of Plaintiff, there is no evidentiary support to infer that Defendants acted contrary to Plaintiff's interests. In fact, Defendants were among the top independent sales representatives for Plaintiff and made continuous attempts to sell Plaintiff's product. It was only after Plaintiff was unable to fulfill Defendants' orders, did Defendant sell comparable products that were available.

### 11. Count 11 – Declaratory Judgment

Count eleven is not a cause of action but rather a request for relief.

### 12. Count 12 - Violation of The Lanham Act and  N.J.S.A. § 56:4-1

The allegations in Count 12 are similarly without merit and rely entirely on Plaintiff's conclusory pleadings for factual support.  In order to prove its Lanham Act and state law claims, Plaintiff must show Defendants' "use of the mark to identify goods or services causes a likelihood of confusion." *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 210 (3d Cir. 2000). In the Third Circuit, courts consider the factors laid out *in Interpace Corp. v. Lapp, Inc.* when determining whether a likelihood of confusion exists:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

721 F.2d 460, 463 (3d Cir. 1983).

Alpine's sole basis for pursuing this claim is that MAV was using its "SKU" number or likening their similar products to that of Alpine's products.  A.) Alpine's SKU number is publicly available on most websites, and its hand sanitizer dispenser in particular bears the SKU of 430-L or 430-F.  This can be easily verified via a "Google search."  When MAV started selling Alpine's products, its invoices specifically used the words **Alternate/430-F T** meaning, an alternative for Alpine – not an "Alpine Dispenser."  The word alternate clearly meant it was an alternate for the Alpine type dispenser and not the same and avoids any confusion whatsoever by a consumer.

More importantly --- there is *zero* evidence in the 10 + months this case has been pending that any dispensers (imported from China)(via Organic Technology) and sold by MAV were labeled or otherwise held out as "Alpine."  They were run of the mill dispensers imported from the same manufacturer.  These were not some trade secreted or unique product that MAV could hold out as a "replacement."  Whomever imported them stuck a label them (or didn't at all) and sold them to an end user.

Many companies in the janitorial/sanitary field sell nearly identical products that customers view as interchangeable.  These items are described/listed based on what the customer designates knows them as, and often try to use the same SKU as already maintained in their systems to avoid duplicate records on the purchasers end. There is no evidence of actual or any perceived customer confusion.

Put simply, many of the invoices exchanged in this case show that MAV was selling an "alt" or "alternative" Alpine product – which is the opposite of causing any type of confusion.  The customers knew they were buying an alternate of the then popular products they were previously buying from Alpine. Plaintiff's informed Defendants' customers that they were no longer Plaintiff's independent sales reps. Further, the names of these products were interchangeable to

customers as the products were essentially identical and all imported from China. Plaintiff did not manufacture any of the products at issue directly and Defendants' customers just wanted similar products. There was nothing special about Alpine dispensers compared to any of the other numerous products with different brand names.  Therefore, there is no evidentiary record to demonstrate that any of Defendants' customers thought they were receiving Alpine products or that Alpine's reputation has in any way been harmed.

**B.    Sanctions Are Warranted Against Plaintiff for Filing a Pleading Without Legal or Factual Support and for Pursuing the Instant Case Without Same.**

**i.)    Rule 11**

Litigants are subject to Rule 11 sanctions for, among other reasons, presenting to the court: (1) a complaint for "an improper purpose such as to harass or cause unnecessary delay or needless increase in the cost of litigation;" (2) "claims, defenses, and other legal contentions . . . [not] warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law," (3) factual contentions that lack evidentiary support and likely will not have support after reasonable opportunity for investigation or discovery. Fed. R. Civ. P. 11(b)(1)-(3).

Federal Rule of Civil Procedure 11(c) outlines the process by which attorneys may seek sanctions for violations of Rule 11(b). Specifically, Rule 11(c)(2) includes a "safe harbor" provision, which provides: "The motion must be served [on the opposing party] under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." The 1993 Committee Notes for Rule 11 provide further guidance regarding the purpose of the safe harbor provision: "[t]o stress the seriousness of a motion for sanctions and to define precisely the conduct claimed to violate the rule." Defendant served this identical Motion

upon Plaintiff and now files this Motion with the Court for Plaintiff's failure to withdraw its Amended Complaint.

The "imposition of a Rule 11 sanction is not a judgment on the merits of an action. Rather, it requires the determination of a collateral issue: whether the attorney has abused the judicial process, and, if so, what sanction would be appropriate." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990). In *Hartmarx*, the Court established three inquiries to be resolved in determining whether an attorney violated Rule 11:

> "The court must consider factual questions regarding the nature of the attorney's prefiling inquiry and the factual basis of the pleading or other paper. Legal issues are raised in considering whether a pleading is 'warranted by existing law or a good faith argument' for changing the law and whether the attorney's conduct violated Rule 11. Finally, the district court must exercise its discretion to tailor an 'appropriate sanction.'"

*Id.* at 399.

The Third Circuit quoted the Supreme Court's holding that "[t]he legal standard to be applied when evaluating conduct allegedly violative of Rule 11 is reasonableness under the circumstances..." *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 289 (3d Cir. 1991) (*quoting Bus. Guides Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 111 S. Ct. 922, 112 L. Ed. 2d 1140 (1990)). According to the Court, "reasonableness [is] defined as an 'objective knowledge or belief at the time of the filing of a challenged paper' that the claim was well-grounded in law and fact." 930 F.2d at 289 (quoting *Jones v. Pittsburgh Nat. Corp.*, 899 F.2d 1350, 1359 (3d Cir. 1990)). The standard "imposes on counsel a duty to look before leaping and may be seen as a litigation version of the familiar railroad crossing admonition to 'stop, look, and listen.'" *Lieb v. Topstone Indus., Inc.,* 788 F.2d 151, 157 (3d Cir. 1986). In weighing reasonableness, "[t]he wisdom of hindsight should be avoided; the attorney's conduct must be judged by 'what was reasonable to believe at the time the pleading, motion, or other paper was

submitted.'" *Mary Ann Pensiero v. Lingle*, 847 F.2d 90, 94 (3d Cir. 1988)(quoting Fed. R. Civ. P. 11 advisory committee note).

Fed. R. Civ. P. 11 requires an attorney who signs a complaint to certify both that it is not interposed for improper purposes, such as delay or harassment,  and that there is a reasonable basis in law and fact for the claim. Rule 11 therefore is  intended to discourage pleadings that are "frivolous, legally unreasonable, or without factual foundation, even though the paper was not filed in subjective bad faith." *Lieb v. Topstone Indus., Inc.*, 788 F.2d 151 (3d Cir. 1986) (quoting *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 831 (9th Cir. 1986)).

To satisfy the affirmative duty imposed by Rule 11, an attorney must inquire into both the facts and the law before filing papers with the court. "The legal standard is one of reasonableness under the circumstances." *Gaiardo v. Ethyl Corp.*, 835 F.2d at 482 (citing *Eavenson, Auchmuty & Greenwald v. Holtzman*, 775 F.2d 535 (3d Cir. 1985)).

Fed.  R. Civ. P. 11. provides that an attorney who fails to either 1) read the pleading; 2) make a reasonable inquiry into the factual and legal legitimacy of the pleading; or 3) file the pleading only for a proper purpose, shall be sanctioned. *Eavenson, Auchmuty & Greenwald v. Holtzman*, 775 F.2d 535, 540 (3d Cir. 1985). To comply with a Rule-11 standard, counsel "must conduct 'a reasonable investigation of the facts and a normally competent level of legal research to support the presentation.'" *Pensiero*, 847 F.2d at 94 (citing *Lieb v. Topstone Indus.*, 788 F.2d 151, 157 (3d Cir. 1986)).

Finally, Rule 11 establishes an ongoing duty to cease litigation of claims that are no longer tenable. See Fed. R. Civ. P. 11(b) ("By presenting to the court a pleading, written motion, or other paper - whether by signing, filing, submitting, or later advocating it. . . .") (emphasis added). As the Notes of the Advisory Committee (1993 Amendment) explain, "if evidentiary support is not

obtained after a reasonable opportunity for further investigation or discovery, the party has a duty under [Rule 11] not to persist with that contention. *Sosinavage v. Thomson*, Civil Action No. 14-3292 (JBS-AMD), 2019 U.S. Dist. LEXIS 20699, at \*9 (D.N.J. Feb. 8, 2019).

Here, it is clear that Plaintiff preformed no requisite due diligence prior to filing not one, but two complaints. A quick internet search would have shown that Plaintiff's prices were readily accessible and available to anyone who wanted to see them. As discussed above, the same requisite investigation would have easily shown the fatal flaws in each of Plaintiff's other claims as well. Even if Plaintiff was unaware of legal and factual futility of their claims at the time it filed its Amended Complaint, after over a year of developing the factual record, there can arguable or reasonable basis for continuing to prosecute these claims. The simple fact is that Plaintiff, in an attempt to avoid paying Defendants duly owed commissions, weaponized legally and factually insufficient complaints to embark on a wild goose chase meant to cause Defendants unnecessary cost and expense. Or worse, from pursuing his lawfully earned commissions when he sold significant products for Alpine – and was deprived commissions n those products. This is not simply an unsuccessful case, but rather an intentional attempt to evade legal obligations and cause financial hardship to Defendants.  (A business solely owned and operated by one Michael DelTito, a sole entrepreneur whose livelihood depends upon his ability to represent a variety of different manufactures as market trends/customer demands are ever changing).

Defendants' undersigned counsel has participated in over 800 federal employment lawsuits, serves as a member of the employment panel in the Eastern District of Pennsylvania, and frequently lectures on employment-law topics.  Plaintiff's egregious conduct herein is so severe as to warrant Rule 11 Sanctions, and Defendants' undersigned counsel cannot recall more than one

other occasion upon which he served a Rule-11 Motion upon an opposing party. This motion is not written lightly without full consideration of Plaintiff's conduct in this case.

WHEREFORE, Defendant respectfully requests an evidentiary hearing to determine whether Plaintiff's counsel, Plaintiff's law firm, and/or Plaintiff shall be sanctioned pursuant to Rule 11 (and to what extent) - and furthermore - that Defendant be awarded reasonable attorney's fees for all of the time expended through hearing on having had to defend Plaintiff's Amended Complaint.

**ii.)    Section 1927 or this Court's Inherent Authority to Sanction**

The Supreme Court has long established that "[c]ourts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Anderson v. Dunn,* 19 U.S. (6 Wheat.) 204, 227, 5 L.Ed. 242 (1821); *accord Ex parte Robinson,* 86 U.S. (19 Wall.) 505, 510, 22 L.Ed. 205 (1873). This Court, as well, has recognized the authority of district courts to wield sanctioning power, in the form of the court's "*inherent* authority," where necessary to preserve the integrity of the judicial process. *Republic of Philippines,* 43 F.3d 65, 73 (3d. Cir., 1994); *accord Eash v. Riggins Trucking, Inc.,* 757 F.2d 557, 560-65 (3d Cir.1985) (discussing thoroughly the inherent powers of courts); *In re Corn Derivatives Antitrust Litig.,* 748 F.2d 157, 160 (3d Cir.1984); *In re Abrams,* 521 F.2d 1094, 1099 (3d Cir.1975); 11A Charles A. Wright et al., *Federal Practice and Procedure* § 2960 (2d ed.1995) (analyzing the inherent power of federal courts to punish in contempt).

Hence, it is well-established that courts have the power to impose sanctions on both litigants and attorneys to regulate their docket, to promote judicial efficiency, and to deter abuse of judicial process. *See Roadway Express,* 447 U.S. at 764-67, 100 S.Ct. at 2463-64. In *Roadway Express,* the Court held that, apart from section 1927, federal courts have the inherent power to award attorney's fees against

31

counsel personally when the court has found that the attorney acted in bad faith. Once a finding of bad faith has been made, the appropriateness of sanctions is a matter entrusted to the discretion of the district court." *Hackman v. Valley Fair,* 932 F.2d 239, 242 (3d Cir.1991).

This Court does have inherent authority as set forth above to sanction, and Defendants and their counsel believe that sanctions are warranted under this Court's inherent authority.  However, the most applicable legal source for sanctions as to Defendant's counsel in the instant case is 28 U.S.C. Section 1927, which states in relevant part:

> Any attorney or other person admitted to conduct cases in any court of the United States or any territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.

When the most material witness in this case: Shabsi Goldberger (the same person who executed the Agreement on behalf of Alpine – and the same person who negotiated same with MAV), appeared for a deposition in this case, it was incumbent upon Plaintiff's Counsel at that time – to withdraw the lawsuit.  Mr. Goldberger literally refused to acknowledge under oath the non-exclusivity provision existent in the Parties' Agreement.  Mr. Goldberger was specifically asked to read paragraph 13, which states:

13. COMPETITIVE PRODUCTS – MAV ASSOCIATES LLC HAS CREATED VERY SUCCESSFUL RELATIONSHIPS WITH THE MANUFACTURERES THAT WE REPRESENT, WE UNERSTAND THAT THERE WILL BE TIMES THAT SOME OF THESE MANUFACTURERS MAY CARRY PRODUCTS OF SIMILAR STYLE, OR BRAND.  WE WILL ALWAYS DO THE VERY BEST WE CAN TO REPRESENT YOUR PRODUCTS TO ALL OF OUR CUSTOMOER BASE.  WE WILL NOT SHARE OR DEVULGE ANY INFORMATION (PRICING, SAMPLES, LITERATURE OR PRIVELAGED COMPANY INFORMATION KNOWINGLY TO A DIRECT COMPETITER OF ALPINE INDUSTRIES, INIC. FOR ANY REASON

When asked if he understood that would mean MAV would be selling competitive products, he answered with a resounding "no," and then testified to his *own interpretation of a black and white contractual provision*.   Goldberger Dep., at p. 93:4-11.   The pertinent testimony pursued as follows:

Q:  Did you understand that MAV Associates, LLC was going to be selling competitive products?

A: No.

Q: Read Paragraph 13 to yourself, and when you're finished, let me know.

A: Yep.

Q: Did you read it?

A: Yep.

Q: What did you understand this to mean when you executed this agreement on behalf of Alpine?

A:  There are some companies that have certain products overlapping, meaning, they'll have **an entire different line of products**, but they might have some like on or two, or whatever the number is, a couple of products that the other company has as well, but their focus is not on those products. . . . .

[Witness' answer is read back to him]

Q: You just said you understood this paragraph to mean that he was representing companies with an entirely different line of products? Is that what you said sir? Was that your testimony; that's what you understood this to mean?

A: Well, no.  My – what I said is when we signed the agreement, that's what it meant, that we do not want him to – that basically, this paragraph or whatever means that – yes, you know what, yes.

. . . . .

Q:  You used the word different.  At the time you signed this Agreement, you were specifically made aware that MAV Associates was representing manufacturers who carried products of the similar style and brand; were you not sir?

A:  I don't recall.

Goldberger Dep., at pp. 93:23-96:16.  Neither at trial in front of a jury, nor at any bench trial in front of this Court would a witness be permitted to proceed with a claim for breach of contract --- based upon that witness claiming the contract states the **exact opposite of what the contract sets forth in express terms**.   If Alpine wanted to sever the business relationship and this Agreement, it had every legal right to cancel the Agreement.  However, the mere fact that it became dissatisfied when MAV exercised its lawful *right* under the Agreement to sell competitive products for its other manufactures does not give rise to a lawsuit for a flurry of state law claims sounding in breach of contract.

        When asked in particular <u>what it was that Alpine perceived was a "breach of contract</u>," Mr. Goldberger testified it was the mere fact that MAV was "selling to our customers."  Goldberger

34

Dep., at p. 51:7-11.  When this Court looks at the record of "customers" at issue here – they are not Alpine's "customers" at all.  They are customers MAV shared with Alpine for a mutually beneficial business proposition (MAV introduces Alpine to numerous different business with whom it had a rapport within the Jan/San industry – and MAV makes commissions off any sales it generates for Alpine).  MAV, not unbeknownst to Alpine, represented <u>other</u> manufacturers who were free to sell to *these same customers as well*. If Alpine did not want MAV selling to any of the same customers, it should have negotiated an "exclusive" sales agreement.  (Just as it had with other sales reps it contracted with.  *See e.g.* Exhibit RR).

Alpine knows what non-exclusivity means and what it entails, as discovery showed it had negotiated exclusivity provisions with other sales reps.  *See e.g.* Exhibit RR (each of these other sales representative agreements contain non-compete & exclusivity provisions that MAV never agreed to, i.e. "AII representatives agree not to distribute or represent like products"; "Representative shall not sell or offer or act as sale agent for the solicitation of products which are competitive with most of the products" or are labeled "Exclusive Sales Agreement").  As the Court can see from many of these other agreements, <u>MAV materially changed and added its non-exclusivity provision, which was unique to the MAV/Alpine Agreement (Exhibit F) and quite different than those agreements Alpine had with its other sales reps</u>.  *Cf.* Exhibit F and Exhibit RR. The mere fact that Alpine changed its mind down the road when MAV opted to exercise its right to not be exclusive does not change the terms of the contract it agreed to.

More concerning, Alpine's attorneys are acutely aware that Alpine withheld commissions from MAV (its independent sales representative) for two (2) whole months' work (July and August 2020) based upon a purported claim of breach, where no breach exists.  Not only does an alleged breach not excuse payment under the New Jersey Sales Representative Act (N.J.S.A § 2A:61A-1,

*et. seq*), this entire lawsuit is being pursued by Alpine (and through Alpine's attorneys) to enable Alpine to avoid making payment of the commissions rightfully earned and due.

When the original Motion to Dismiss was filed in this case (in Nov. 2020), articulating that Alpine had not set forth any "confidential" information which was improperly acquired by MAV, Alpine amended its suit to allege:

> "Plaintiff provides its sales representatives access to the aforementioned confidential information - including, manufacturer information, wholesale pricing, shipping fees, samples, advertising and selling literature, displays, drawings, engineering, customer's preferred products, client lists and other product data."

Exhibit P at para 17. The is **no** evidence that MAV was ever privy to the manufacturer supplying Alpine's products, let alone using that "confidential" information to its advantage. Alpine used air freight (vs. boat) during the height of the pandemic, but this was no secret and this information was shared directly with all prospective and existing clients. *See* Exhibit K (Marchwinski giving the differences in price between air freight and sea freight and encouraging sales reps to share that information with customers). There is **no** evidence that MAV was ever privy to the wholesale prices Alpine was paying to obtain its produce (the record is devoid of any such evidence). There is **no** evidence that any "samples" or "literature" were shared with MAV that were not *also* shared with the general public online, or via distribution to any customers (existing or prospective) who asked for same. *See* SUMF at ¶¶ 103-127.

The allegations in paragraph 17 of the Amended Complaint were clearly made to moot the Motion to Dismiss originally filed, but has no factual basis to support any such averment. This is the quintessential evidence that Court's consider pursuant to Rule 11. *See e.g. Gen. Dev. Corp. v. Binstein*, 743 F. Supp. 1115, 1141 (D.N.J. 1990)(considering Rule 11 sanctions where attorneys

"continu[e] to press an insupportable action despite mounting evidence that the action has no basis; and (2) by filing papers with the court that are disingenuous.").  If Alpine's attorneys had asked the same questions Mr. Goldberger was asked in his deposition, they would have confirmed Alpine gave MAV no manufacture's information nor any confidential literature or business information. There were no "customer preferred" products that were confidential:  every Jan/San distributor was looking for the same things: PPE in the form of hand sanitizer, stands to dispense hand sanitizer – so they could continue to operate the businesses in the wake of a mandated government ordered shut down.  (The end users included gyms, traditional work places and the like).

Blind ignorance to the facts of record as they clearly develop is not a basis to continue pursuing a lawsuit and Alpine's attorneys should have advised their client accordingly once discovery became crystal clear they had no factual basis to support their allegations.

### IV. Conclusion

For the foregoing reasons, Defendants respectfully requests that Plaintiff's be Ordered to appear at Hearing at a time and date set by this Court to show cause why they should not be sanctioned for this frivolous litigation – for each and every Count they pursued in this Complaint.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By:     */s/ Christine E. Burke*
          Ari R. Karpf, Esq.
          Christine E. Burke, Esq.
          J. Patrick Griffin, Esq.
          3331 Street Road
          Bensalem, PA 19020

Dated:  December 10, 2021

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| TIGER SUPPLIES INC D/B/A ALPINE INDUSTRIES, INC., | CIVIL ACTION |
|  | NO.: 20-15566 |
| *Plaintiff*, |  |
| v. |  |
| MAV ASSOCIATES LLC, AND MICHAEL DEL TITO, |  |
| *Defendants*. |  |

## <u>CERTIFICATE OF SERVICE</u>

I certify on the date set forth below that Defendants served Plaintiff's counsel of record below with a copy of the instant Rule-11 Motion, provided Plaintiff with twenty-one (21) days to withdraw its Amended Complaint, and that this Motion is now being filed due to Plaintiff's failure to withdraw its Amended Complaint.

**JACOBOWITZ NEWMAN TVERSKY LLP**

Abraham S. Beinhorn, Esq.
Evan M. Newman, Esq.
695 Cross Street, Suite 192
Lakewood, New Jersey 08701
abeinhorn@jntllp.com

**KARPF, KARPF & CERUTTI, P.C.**

*/s Christine E. Burke*

Ari R. Karpf, Esq.
Christine E. Burke, Esq.
J. Patrick Griffin, Esq.

Dated: December 10, 2021