<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|   |   |   |
|---|---|---|
| TIGER SUPPLIES INC d/b/a ALPINE INDUSTRIES, INC, | : : : | **Civil Action No. 20-15566 (SRC)** |
| Plaintiff, | : : | |
| v. | : : | **OPINION** |
| MAV ASSOCIATES LLC AND MICHAEL DEL TITO, | : : : | |
| Defendants. | : : | |

**CHESLER**, District Judge

This matter comes before the Court on the motion for summary judgment filed by Defendants MAV Associates LLC ("MAV") and Michael Del Tito ("Del Tito") (collectively "Defendants"). (ECF No. 42). Plaintiff Tiger Supplies Inc d/b/a Alpine Industries, Inc. ("Plaintiff" or "Alpine") has opposed Defendants' motion and filed its own cross-motion for partial summary judgment. (ECF No. 44). The Court, having considered the papers filed by the parties, proceeds to rule on the motions without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons that follow, the Court will deny Defendants' motion for summary judgment in part and grant it in part and deny Plaintiff's cross-motion for summary judgment.

## I. BACKGROUND

This case arises out of a contractual dispute between Alpine and MAV. Alpine is a manufacturer and distributor of products in the food service and janitorial industries.[1] (Plaintiff's

---

[1] Defendants contest Alpine's description of itself as a "manufacturer" because the record indicates Alpine did not manufacture any of the products at issues here but rather imported them from China. (Defendants' Opposition to Plaintiffs' Statement of Uncontested Material Facts ¶ 1). While this may be true, Defendants also concede that it is

Statement of Uncontested Material Facts ¶ 1) [hereinafter "Plaintiff's SUMF"].   MAV is an independent manufacturer's representative in the janitorial and sanitation industry and Del Tito is MAV's sole member.[2]   (Defendants' Statement of Uncontested Material Facts ¶¶ 5, 8, 10) [hereinafter "Defendants' SUMF"].

In January 2018, the parties entered into a Sales Representative Agreement ("the Agreement").[3]   (Defendants' SUMF ¶¶ 24, 25; Plaintiff's SUMF ¶ 5).   In relevant part, the Agreement authorized MAV to sell Alpine's products to janitorial dealers in a specified geographic area.   (Agreement ¶¶ 2, 3).   It also required that MAV use its "best sales effort" throughout the territory.   (Agreement ¶ 12) [hereinafter "Paragraph 12"].   Finally, the Agreement contained a section titled "Competitive Products," which reads in full:

> MAV Associates LLC has created very successful relationships with the manufactureres [sic] that we represent, we unerstand [sic] that there will be times that some of these manufacturers may carry products of similar style, or brand. We will always do the very best we can to represent your products to all of our customoer [sic] base. We will not share or devulge [sic] any information pricing, samples, literature or privelaged [sic] company information knowingly to a direct competiter [sic] of Alpine Industries, Inic. [sic] for any reason.

(Agreement ¶ 13) [hereinafter "Paragraph 13"].

Plaintiff alleges Defendants breached the Agreement beginning in mid-2020.   Around that time, demand for Plaintiff's products, especially its soap dispensers and trash cans, increased exponentially because of the COVID-19 pandemic.   (Defendants' SUMF ¶¶ 40, 41; Plaintiff's

---

"common in the industry to call oneself a manufacturer even if [you are] getting the product and importing it."  (Def. Reply Br. at 4 n.1); see also (Def. Br. at 10).   Thus, the Court finds that Alpine's description of itself as a "manufacturer" is accurate here.

[2] Plaintiff asserts that Del Tito's wife, Arlynn Wiley ("Wiley"), "was also [a MAV] officer or employee" during the relevant time period.  (Plaintiff's Opposition to Defendants' SUMF ¶ 2).  However, Plaintiff admits that Del Tito testified at his deposition that he was MAV's sole member.  (Plaintiff's Opposition to Defendants' SUMF ¶ 2); see also (Del Tito Dep. 8:8-10).  And Wiley was originally a named Defendant in this litigation, but the parties agreed to dismiss any claims against her without prejudice in March 2021.  (ECF No. 21).  Given all of this, the Court finds that it is inconsequential whether Wiley was also affiliated with MAV for the purposes of the pending motions.

[3] Both parties attached the Agreement to their briefing materials.  (Def. Br., Exhibit F; Pl. Br., Exhibit 1).

2

SUMF ¶ 13).  Simultaneous with this increase in demand, Defendants began working with a man named William Tan ("Tan") who operated two competing manufacturers—Organic Technologies and Green Health Choice LLC.  (Plaintiff's SUMF ¶¶ 28, 29).   Plaintiff alleges Tan located Alpine's suppliers and then he and MAV used them "to buy Alpine's products at the source and sell them directly to Alpine's customers."  (Plaintiff's SUMF ¶¶ 32–37, 41).  Plaintiff maintains Del Tito was aware that Tan had found Alpine's suppliers but did not alert Alpine to this fact.  (Plaintiff's SUMF ¶ 39).  Plaintiff also alleges that MAV and Tan sold their products utilizing the same store keeping units (SKUs) and product descriptions as those used by Alpine, (Plaintiff's SUMF ¶ 24), and even convinced customers that had placed orders with Alpine to instead purchase products directly from Tan and MAV, (Plaintiff's SUMF ¶ 27).  For Plaintiff, all of these actions violated the Agreement.

Alpine terminated the Agreement in September 2020, (Defendants' SUMF ¶ 79), and then filed a complaint against Defendants in New Jersey state court, (ECF No. 1).  Defendants removed the action to this Court in November 2020.  (ECF No. 1).   After removal, Plaintiff filed an Amended Complaint, which includes twelve different causes of action: Count 1 for breach of contract against MAV, Count 2 for breach of the implied covenant of good faith and fair dealing against MAV, Count 3 for violation of the New Jersey Trade Secrets Act against both Defendants, Count 4 for misappropriation of confidential information against both Defendants, Count 5 for tortious interference with business relations and prospective economic advantage against both Defendants, Count 6 for unfair competition against both Defendants, Count 7 for conversion against both Defendants, Count 8 for permanent injunction, Count 9 for breach of fiduciary duty against both Defendants, Count 10 for breach of the faithless servant doctrine against both Defendants, Count 11 for declaratory judgment, and Count 12 for violation of the Lanham Act and

N.J. Stat. Ann. § 56:4-1 against both Defendants.  Defendants answered the Amended Complaint with three counterclaims related to allegedly unpaid commissions Alpine owes them: Count 1 for violation of the New Jersey Sales Representative Rights Act ("SRRA"), Count 2 for breach of contract, and Count 3 for detrimental reliance, promissory estoppel, and unjust enrichment.  (ECF No. 11).

Discovery has since commenced.  A couple of months ago, Defendants filed a motion for sanctions, (ECF No. 33), which the Court dismissed without prejudice as premature, (ECF No. 39).  However, in response to this motion, Plaintiff agreed to withdraw Counts 3, 4, and 7 of the Amended Complaint—the claims for violation of the New Jersey Trade Secrets Act, misappropriation of confidential information, and conversion.[4]  (ECF No. 37).  Defendants now seek summary judgment in their favor on the remaining counts of the Amended Complaint as well as their counterclaims.  In response, Plaintiff (1) seeks summary judgment in its favor on its breach of contract and breach of good faith and fair dealing claims against MAV and (2) opposes Defendants' motion for summary judgment on the remaining claims in the Amended Complaint and Defendants' counterclaims.

## II.   DISCUSSION

### A.  Legal Standard

The Court evaluates the parties' cross-motions for summary judgment under Federal Rule of Civil Procedure 56(a).  Rule 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  It is well-established that a factual dispute is genuine if a reasonable jury could return a verdict for the nonmovant and material if, under the

---

[4] Because Alpine agreed to drop these three counts, the parties did not address them in their briefing and the Court will not address them here.

substantive law, the dispute would affect the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "Although the burden of proof rests initially with the party moving for summary judgment, when a motion is made and supported," the nonmoving party must establish the existence of a genuine issue as to a material fact in order to defeat the motion.  Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985).

To create a genuine issue of material fact, the nonmoving party must come forward with sufficient evidence to allow a jury to find in its favor at trial.  Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001), overruled on other grounds by Ray Haluch Gravel Co. v. Cent. Pension Fund of the Int'l Union of Operating Eng'rs and Participating Emp'rs, 571 U.S. 177 (2014).  As such, the nonmovant cannot rest on mere allegations; instead, it must present actual evidence that creates a genuine issue as to a material fact for trial.  Anderson, 477 U.S. at 248; see also Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) (holding that "unsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment").

When considering a motion for summary judgment, a district court "must view the evidence 'in the light most favorable to the opposing party.'"  Tolan v. Cotton, 572 U.S. 650, 657 (2014) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)).  It may not make credibility determinations or otherwise weigh the evidence.  Anderson, 477 U.S. at 255; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004).  With this standard in mind, the Court addresses the parties' arguments below.

## B.  Neither Alpine nor MAV is Entitled to Summary Judgment on Plaintiff's Breach of Contract Claim

Both Plaintiff and MAV argue that they are entitled to summary judgment on Plaintiff's claim that MAV breached the Agreement.  New Jersey law requires four elements to establish a

breach of contract claim: "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations."[5] Frederico v. Home Depot, 507 F.3d 188, 203 (3d Cir. 2007); see also Globe Motor Co. v. Igdalev, 139 A.3d 57, 64 (N.J. 2016).

Plaintiff contends that MAV's actions constitute a breach of the Agreement for three reasons: (1) because the Agreement created an exclusive relationship between the parties, (2) because MAV used Plaintiff's confidential information during the course of its relationship with Tan, and (3) because MAV's actions ran afoul of the Agreement's requirement that MAV utilize its best efforts to sell Alpine's products.  (Pl. Br. at 12–18; Plaintiff's SUMF ¶¶ 22, 49).  MAV argues that (1) the parties' relationship was non-exclusive, (2) it did not use any of Plaintiff's confidential information, and (3) it did not contravene the "best efforts" requirement in the Agreement.  (Def. Br. at 8–15; Def Reply Br. at 8–12).

The Court will deny both motions for summary judgment.  Plaintiff's first and second arguments are meritless—the plain language of the Agreement indicates that the parties' relationship was non-exclusive, and Plaintiff has not identified any evidence indicating that MAV used its confidential information.  However, Plaintiff's third argument fares better—the Court concludes that there is a contested issue of material fact as to whether MAV's actions breached the Agreement's requirement that it use its best efforts to sell Alpine's products.  As such, because there is a genuine issue regarding whether MAV breached the contract, neither Alpine nor MAV is entitled to summary judgment.

    1.   The Agreement Created a Non-Exclusive Relationship Between Alpine and MAV

First, the Agreement did not create an exclusive relationship.  When interpreting a contract

---

[5] Neither party objects to the application of New Jersey law here.

under New Jersey law, a court must "examine the plain language of the contract and the parties' intent, as evidenced by the contract's purposes and surrounding circumstances." State Troopers Fraternal Ass'n of N.J., Inc. v. State, 692 A.2d 519, 523 (N.J. 1997).  In undertaking this task, a court reads the contract "as a whole and in a fair and common sense manner." Hardy ex rel Dowdell v. Abdul-Matin, 965 A.2d 1165, 1169 (N.J. 2009).  "[A] court's role is to consider what is written in the context of the circumstances at the time of drafting and to apply a rational meaning in keeping with the 'expressed general purpose.'" Pacifico v. Pacifico, 920 A.2d 73, 77 (N.J. 2007) (quoting Atl. N. Airlines, Inc. v. Schwimmer, 96 A.2d 652, 656 (N.J. 1953)).

Alpine does not identify a single provision in the Agreement that allegedly makes the parties' relationship exclusive.  Instead, it simply refers to the Agreement as "exclusive" without putting forth any evidence to support this contention.  As the Third Circuit has explained, courts must "bind parties by the objective manifestations of their intent," the strongest indicator of which is "the words they use in their written contract." Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1009 (3d Cir. 1980).  Where, as here, the parties' agreement does not include a provision as important as an exclusivity clause, the Court may not assume the parties' intended to include one and read it into the contract after the fact. See East Brunswick Sewerage Auth. v. East Mill Assocs., Inc., 838 A.2d 494, 497 (N.J. Super. Ct. App. Div. 2004) ("A court has no power to rewrite the contract of the parties by substituting a new or different provision from what is clearly expressed in the instrument.")

The absence of an exclusivity provision in the Agreement provides a stark contrast to Alpine's other sales representative contracts.  Most of those contracts contain explicit exclusivity clauses.[6]  For example, a number of them state "[Alpine] provides a wide variety of Janitorial

---

[6] Plaintiff argues the Court is barred from considering these contracts under the parol evidence rule.  The parol evidence rule "prohibits the introduction of evidence that tends to alter an integrated written document." Conway v.

Equipment. [Alpine] representatives agree not to distribute or represent like products."  (Def. Br., Exhibit RR, PageID# 2345, 2348, 2351, 2354, 2357, 2364, 2369, 2376, 2379).  The Agreement here does not contain any similar statements.

In fact, as MAV argues, the Agreement appears to explicitly include a provision contemplating a non-exclusive relationship between the parties.  Paragraph 13 of the Agreement references MAV's "very successful relationships with the manufactureres [sic] that we represent." (Agreement ¶ 13).  And it warns that "there may be times that some of these manufacturers may carry products of similar style, or brand."  (Agreement ¶ 13).  Both of these statements indicate that the parties understood that MAV would be working with other manufacturers besides Alpine.  See Jones Distrib. Co. v. White Consol. Indus., Inc., 943 F. Supp. 1445, 1464–65 (N.D. Iowa 1996) (finding that the parties had a non-exclusive contract where the record demonstrated that they had always operated as if their relationship was non-exclusive).

Alpine argues that the Agreement's references to other manufacturers merely mean that Paragraph 13 was a "narrow carveout" to the parties' exclusive relationship, allowing MAV to work with the manufacturers it represented at the time the Agreement was signed but not any new manufacturers.  (Pl. Br. at 13–14).  For Alpine, because MAV's relationship with Tan and his businesses began after the Agreement was formed, MAV's actions defied this "narrow carveout." (Pl. Br. at 13–14).

---

287 Corp. Ctr. Assocs., 901 A.2d 341, 346 (N.J. 2006); see also Restatement (Second) of Contracts § 213 (1981). New Jersey has adopted an expansive view as to when extrinsic evidence may be admitted to aid the interpretation of a contract.  Conway, 901 A.2d at 346; see also City of Atl. City v. Zemurray Street Cap., No. 14-cv-05169, 2017 WL 6638203, at *13 (D.N.J. Dec. 29, 2017) ("[T]he New Jersey Supreme Court does not strictly apply the parol evidence rule.").  Under this view, "[e]xtrinsic evidence may be used to uncover the true meaning of the contractual terms. It is only after the meaning of the contract is discerned that the parol evidence rule comes into play to prohibit the introduction of extrinsic evidence to vary the terms of the contract."  Id. at 347.  Therefore, because Alpine's previous contracts shed light on the meaning of the Agreement's terms rather than varying the terms of the contract, the Court may properly consider them here.

Alpine's argument belies common sense.  See Hardy, 965 A.2d at 1169 (directing courts to read contracts "in a fair and common sense manner").  For one, Paragraph 13 cannot create a "narrow carveout" from the parties' exclusive relationship without any provision establishing that exclusive relationship in the first place.  As discussed above, Alpine does not identify any such provision in the Agreement.  Second, Alpine does not provide any rational reason why the Agreement would have distinguished between MAV's current and future manufacturers and distributors.  As MAV points out, it could have represented tens or even hundreds of other manufacturers and distributors at the time the Agreement was signed.  (Def. Br. at 12).  If Alpine were concerned about MAV's representation of other manufacturers and distributors the "narrow carveout" it proposes would have had very little effect in mitigating that concern.

In all, the mere fact that MAV had a relationship with another manufacturer (Tan) did not violate the Agreement because the Agreement did not create an exclusive relationship between the parties.

2.  There is No Genuine Issue of Fact as to Whether MAV Used Plaintiff's Confidential Information

At various times, Plaintiff appears to allege that MAV used its confidential information to sell products for Tan.  (Plaintiff's SUMF ¶¶ 22, 49).  If proven, this would violate the Agreement because MAV specifically agreed not to share Alpine's confidential information.  (Agreement ¶ 13) ("We will not share or devulge [sic] any information pricing, samples, literature or privelaged [sic] information knowingly to a direct competiter [sic] of [Alpine] . . . .").  However, the record does not support Alpine's allegation that MAV used any of its confidential information.

Alpine primarily relies on a certification submitted by its Director of Operations, Shabsi Goldberger, to support its allegation.  (Pl. Br., Exhibit 1 ¶ 1) [hereinafter "Goldberger Certification" or "Certification"].  In that Certification, Goldberger attests to certain facts he "knew

prior to filing the Amended Complaint based on [his] personal knowledge, information and documents that were provided to [Alpine]." (Goldberger Cert. ¶ 4). Goldberger explains that he "learned" MAV was "working with a new manufacturer to directly compete with Alpine using [Alpine's] confidential product information and selling directly to [Alpine's] customers." (Goldberger Cert. ¶ 20).

The Certification does not create a genuine issue of material fact as to whether MAV used Alpine's confidential information. Most importantly, it does not identify any specific occurrences in which MAV used Alpine's confidential materials to market Tan's products. Without any reference to specific, confidential information Alpine provided to MAV and specific occurrences in which MAV misappropriated this information, there is no basis for the Court to conclude that there is a genuine issue of material fact as to whether MAV violated the Agreement's confidentiality provision. Hoskins v. Valcor Eng'g, No. 14-cv-06536, 2017 WL 1023353, at *4 (D.N.J Mar. 16, 2017) ("To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party.").

The Certification is also contradicted by Goldberger's own deposition testimony. During his deposition, Goldberger speculated that perhaps the only confidential information used by MAV was Alpine's pricing information. (Goldberger Dep. 113:1-24). This assertion is not supported by any evidence in the record. Alpine admits that, under the Agreement, they had sole discretion to set the prices for their products. (Defendants' SUMF ¶ 115; Plaintiff's Response to Defendants' SUMF ¶ 115). In light of this arrangement, MAV asserts that it never received any confidential pricing information from Alpine. (Defendants' SUMF ¶ 113). Alpine objects to this statement by citing a portion of Del Tito's deposition testimony in which he stated that MAV received "catalogs,

specification sheets, samples and literature" from Alpine.  (Plaintiff's Response to Defendants' SUMF ¶ 113) (citing Del Tito Dep. 47:13-25).  As above, however, without any further detail as to whether these materials contained confidential pricing information and, further, how MAV used that information, the Court cannot conclude from Del Tito's testimony that there is a genuine issue of material fact regarding whether MAV used Alpine's confidential pricing information.

Therefore, the Goldberger Certification upon which Alpine principally relies is simply a "conclusory, self-serving affidavit" with respect to Alpine's allegation that MAV used its confidential information.  Kireis v. Dickie McCamey & Chilcote, P.C., 560 F.3d 156, 161 (3d Cir. 2009).  The Court cannot conclude that there is a genuine issue of material from such an affidavit. Id.; see also Dicent v. Kaplan Univ., 758 F. App'x 311, 314 n.5 (3d Cir. 2019).  Thus, the Court finds MAV did not use Alpine's confidential information in violation of the Agreement.[7]

3.  There is a Genuine Issue of Material Fact as to Whether MAV's Actions Violated the Agreement's "Best Efforts" Clauses

Even though the Agreement was non-exclusive and MAV did not use any of Alpine's confidential information, there is still a genuine dispute of material fact as to whether MAV's actions violated the Agreement.  That is because two provisions in the Agreement required that MAV use its "best efforts" to sell Alpine's products.  The first, found in Paragraph 12, states that Alpine expected MAV to "give it their best sales effort."  (Agreement ¶ 12).  The second, in Paragraph 13, explains that MAV would "always do the very best [it] can to represent" Alpine's products to its customers.  (Agreement ¶ 13).

---

[7] The Court also notes that Alpine dropped its claims related to MAV's alleged misappropriation of its confidential information in response to Defendants' motion for sanctions.  (ECF No. 37).  While this is not dispositive of the issue, it certainly lends weight to the Court's conclusion that Alpine has not adduced enough evidence to create a material fact as to whether MAV used Alpine's confidential information in violation of the Agreement.

A reasonable jury could conclude that specific actions MAV took during its relationship with Tan violated these "best efforts" clauses.[8] <u>SodexoMagic, LLC v. Drexel Univ.</u>, 24 F.4th 183, 203–04 (3d Cir. 2022) (explaining that a dispute is genuine if a "reasonable jury could return a verdict for the nonmoving party" (quoting <u>Anderson</u>, 477 U.S. at 248)).  There is evidence that, sometime in Spring 2020, Tan was provided with Alpine's products.[9]  (Plaintiff's SUMF ¶ 32) (citing Tan Dep. 70:18–71:12).  He then proceeded to identify Alpine's suppliers and reported back to MAV (through Del Tito) when he did.  (Plaintiff's SUMF ¶ 38) (citing Golberger Cert. Exhibit F & Tan Dep. 53:12-21).  MAV then sold products on Tan's behalf using the same SKUs and product descriptions as those used by Alpine.[10]  (Plaintiff's SUMF ¶ 24; Golberger Cert. Exhibits B-D).  MAV even described the products it was selling as "Alpine" or an "Alternative" to Alpine.  (Goldberger Cert., Exhibits B-D).  Furthermore, MAV would sometimes directly bill customers for products it sold on Tan's behalf.  (Goldberger Cert., Exhibits B-D).  Indeed, it appears that, on at least one occasion, MAV explicitly told a customer that it could provide the same products to the customer at a cheaper price than Alpine.  (Pl. Br., Exhibit 3) (email from customer explaining that they cancelled an order with Alpine "because [Del Tito] offered [the products] through MAV at cheaper cost").

---

[8] Importantly, the mere fact that MAV had a relationship with Tan did not contravene the Agreement's "best efforts" clauses.  As discussed above, the potential that MAV might have relationships with other manufacturers is expressly contemplated by the Agreement.  The "best efforts" clauses cannot transform the parties' relationship from a non-exclusive arrangement into an exclusive one.

[9] Alpine appears to insinuate that MAV provided Tan with the names of its suppliers.  (Pl. Br. at 11) (explaining that Tan "somehow obtained Alpine's products and used them to source Alpine's overseas manufacturers").  But Alpine has also admitted that it did not disclose the identity of its suppliers to MAV.  (Defendants' SUMF ¶ 111; Plaintiff's Response to Defendants' SUMF ¶ 111).  So, MAV could not have given the names of Alpine's suppliers to Tan.

[10] MAV does not appear to dispute that it used the same product descriptions and SKUs as those used by Alpine, but rather argues that this information was not confidential.  (Defendants' Response to Plaintiff's SUMF ¶ 24).  However, the fact that this information was publicly available is irrelevant in determining whether Alpine contravened the Agreement when it used the information to sell products on behalf of Alpine's competitor.

While circumstantial, this evidence is sufficient to conclude that MAV used Alpine's information to actively aid Tan in setting up a manufacturer that directly competed with Alpine. That would run afoul of the Agreement "best efforts" clauses. As discussed above, the Agreement did not create an exclusive relationship and even allowed MAV to represent manufacturers that carried "products of similar style, or brand" as Alpine. But MAV cannot possibly have been using its "best efforts" to represent Alpine while it was also (1) using Alpine's labels and product information to sell products at a lower price on behalf of a competing manufacturer and (2) billing customers directly for those products.

MAV argues that other businesses in the industry were also using Alpine's product descriptions and labels to sell their products. (Def. Br. at 23–25; Def. Br., Exhibit J). For MAV this practice was sensical because most manufacturers in the market at the time were selling generic products that were identical to Alpine's products. (Def. Br. 25–26). And, like Alpine, most of those manufacturers were importing those products from China. (Def. Br. at 25–26). So, for MAV, the use of Alpine's was simply a convenient way of describing the product being sold by referencing products the customers had previously purchased. (Def. Br. at 26).

The Court declines to conclude as a matter of law that the use of Alpine's information was standard practice in the industry, and, therefore, not a violation of the Agreement, from the mere fact that other businesses were also using the Alpine label to sell their products. Tolan, 572 U.S. at 657 (explaining that the court must view the evidence in the light most favorable to the nonmoving party when evaluating a motion for summary judgment). Further, unlike those other businesses, MAV had an obligation use its best efforts to sell Alpine's products even if those products were identical to all of the other products being sold on the market. The use of Alpine's information to aid a direct competitor is evidence that MAV did not uphold this obligation. As

such, there is a genuine issue of material fact as to whether MAV's actions during its relationship with Tan violated the Agreement.  The Court will deny both motions for summary judgment on the basis of this contested issue.

### C.  Defendants are Entitled to Summary Judgment on the Rest of Plaintiff's Claims[11]

#### 1.  Breach of the Covenant of Good Faith and Fair Dealing

Both Plaintiff and MAV also argue that they are entitled to summary judgment on Plaintiff's breach of the covenant of good faith and fair dealing claim.  Because a good faith and fair dealing claim cannot arise out of the same conduct as a breach of contract claim, the Court will grant MAV's motion for summary judgment and, alternatively, deny Plaintiff's motion.

 "Every contract in New Jersey contains an implied covenant of good faith and fair dealing."  Sons of Thunder, Inc. v. Borden, Inc., 690 A.2d 575, 587 (N.J. 1997).  Under that covenant, "neither party shall do anything which will have the effect of destroying or injuring the right of the other to receive the fruits of the contract."  Palisades Props., Inc. v. Brunetti, 207 A.2d 522, 531 (N.J. 1965) (internal quotation omitted).  "However, breach of the implied covenant of good faith and fair dealing does not create an independent cause of action when it is based on the same underlying conduct as [a] breach of contract claim."  Hills v. Bank of Am., No. 13-cv-04960, 2015 WL 1205007, at *4 (D.N.J. Mar. 17, 2015).  Rather, New Jersey law provides for an independent cause of action based on the covenant of good faith and fair dealing in only three limited situations:

> (1) to allow the inclusion of additional terms and conditions not expressly set forth in the contract, but consistent with the parties' contractual expectations; (2) to allow redress for a contracting party's bad-faith performance of an agreement, when it is a pretext for the exercise of a contractual right to terminate, even where the

---

[11] In addition to the claims discussed below, Plaintiff's Amended Complaint contains a count for "Permanent Injunction" and a count for "Declaratory Judgment."  (ECF No. 7).  Since those are both requests for relief, the Court will not address them at this time.

defendant has not breached any express term; and (3) to rectify a party's unfair exercise of discretion regarding its contract performance.

Barows v. Chase Manhattan Mortg. Corp., 465 F. Supp. 2d 347, 365 (D.N.J. 2006).

Here, Plaintiff's good faith and fair dealing claim is duplicative of its breach of contract claim. Plaintiff argues that "MAV's relationship with Tan" and its "<u>active</u> role in setting up a <u>new</u> competitor of Alpine's" violated the covenant of good faith and fair dealing. (Pl. Br. at 18–19) (emphasis in original). This is the same conduct that the Court found could constitute a breach of the Agreement. As such, it cannot also constitute a breach of the covenant of good faith and fair dealing. TBI Unlimited, LLC v. Clear Cut Lawn Decisions, LLC, No. 12-cv-03355, 2013 WL 6048720, at *3 (D.N.J. Nov. 4, 2013) ("A breach of the covenant of good faith and fair dealing must not arise out of the same conduct underlying an alleged breach of contract action."); see also Wade v. Kessler Inst., 798 A.2d 1251, 1261–62 (N.J. 2002) (explaining that a defendant cannot be found liable for breach of the implied covenant based on conduct that also constitutes breach of the express terms of the contract). Thus, the Court will dismiss Alpine's good faith and fair dealing claim.

2.   <u>Tortious Interference with Business Relations and Prospective Economic Advantage</u>

The Court will also grant Defendants' motion for summary judgment on Plaintiff's tortious interference claim. Plaintiff has not alleged that Defendants interfered with any pre-existing contracts it had with its customers, so its claim must be based on Defendants' interference with a prospective economic advantage. See Printing-Mart Morristown v. Sharp Elecs. Corp., 563 A.2d 31, 36 (N.J. 1989) ("The separate cause of action for the intentional interference with a prospective contractual or economic relationship has long been recognized as distinct from the tort of interference with the performance of a contract."). Under New Jersey law, interference with prospective economic advantage consists of four elements: (1) a protectable right—some potential

economic or contractual relationship, (2) malice or harm inflicted intentionally without justification or excuse, (3) the loss of prospective gain, and (4) damages.  MacDougall v. Weichert, 677 A.2d 162, 174 (N.J. 1996).

Plaintiff has not specifically identified any prospective gains it lost as a result of Defendants' alleged tortious interference.  "To sustain a claim of tortious interference, a plaintiff must do more than assert that it lost business."  Advanced Oral Techs., LLC v. Nutrex Rsch., Inc., No. 10-cv-05303, 2011 WL 1080204, at *4 (D.N.J. Mar. 21, 2011).  Instead, at the very least, the plaintiff must identify "a single, specific customer" it either lost or could have acquired but for the defendant's conduct.  Am. Millenium Ins. Co. v. First Keystone Risk Retention Grp., 332 F. App'x 787, 790–91 (3d Cir 2009).  Here, Plaintiff claims that Defendants' allegedly tortious actions caused it to lose out on "significant sales," (Pl. Br. at 21), but never identifies any specific sales or relationships it lost.  The mere allegation that Alpine missed out on "unknown customers" is insufficient to establish a tortious interference claim under New Jersey law.  Austar Int'l Ltd. v. AustarPharma LLC, 425 F. Supp. 3d 336, 358 (D.N.J. 2019) ("[T]he claimed loss of . . . unknown customers cannot, standing alone, state a claim for tortious interference with prospective business relations." (alteration in original) (quoting Harmon v. Borough of Belmar, No. 17-cv-02437, 2018 WL 6068216, at *8 (D.N.J. Nov. 20, 2018))).

The closest Plaintiff comes to identifying record evidence of a specific prospective gain it lost is an email chain in which it appears a customer cancelled an order with Alpine and purchased products from MAV because MAV offered the products at cheaper cost.  (Pl. Br., Exhibit 3).  But this email chain alone cannot sustain a claim for tortious interference.  For one, the mere offer of a lower price does not indicate that MAV had the requisite ill will towards Alpine because price competition alone does not constitute malice.  See, e.g., Ideal Dairy Farms, Inc. v. Farmland Dairy

Farms, Inc., 659 A.2d 904, 933 (N.J. Super. Ct. App. Div. 1995) (holding that the defendants did not commit tortious interference when they targeted the plaintiff's customers with prices that were unprofitable for them); Energex Lighting Indus., Inc. v. N. Am. Philips Lighting Corp., 765 F. Supp. 93, 109–10 (S.D.N.Y. 1991) (applying New Jersey law and holding that the defendants' "aggressive sales policy" of beating plaintiff's prices was not tortious interference).  And, even assuming that MAV did act with malice, Alpine has not identified any evidence from which the court could conclude that the customer would have gone through with the purchase with Alpine rather than, for example, looking for another competitor who, like MAV, could also quickly provide the products at a lower price.  Printing-Mart, 563 A.2d at 37 (explaining that it must be reasonably probable that the alleged interference caused the loss of prospective gain).  In all then, while the emails show that MAV, on at least one occasion, undercut Alpine by offering identical goods to an existing customer at a lower price, this does not constitute tortious interference with prospective economic advantage.  Therefore, Defendants are entitled to summary judgment on Plaintiff's tortious interference claim.

### 3.  Unfair Competition

Similarly, Defendants are entitled to summary judgment on Plaintiff's unfair competition claim.  "The amorphous nature of unfair competition makes for an unevenly developed and difficult area of jurisprudence." Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co., 921 F. Supp. 747, 786 (D.N.J. 1995).  In general, it "seeks to espouse some baseline level of business fairness." Id.  New Jersey courts have applied a flexible standard of liability to allow the tort of unfair competition to fit changing circumstances.  Avaya Inc., RP v. Telecom Labs, Inc., 838 F.3d 354, 386 (3d Cir. 2016).  Given this flexibility, unfair competition has been described as a "general rubric which subsumes various other causes of actions," C.R. Bard, Inc. v. Wordtronics Corp., 561 A.2d 694, 697 (N.J. Super. Ct. Law Div. 1989), including "tortious interference, breach of duties

of good faith and fair dealing, misappropriation and defamation," Coast Cities, 912 F. Supp. at 786.

Defendants argue that Alpine's unfair competition claim should be dismissed because it is a "subspecies" of its tortious interference claim.  (Def. Br. at 20).  To the extent Plaintiff's unfair competition claim relies on the allegation that Defendants cooperated with Tan to undermine Alpine's business relationships with its customers, Defendants are correct that it is meritless. These facts are the same ones underlying Plaintiff's tortious interference claims.  Because they do not rise to the level of tortious interference, the Court also concludes that they cannot support an unfair competition claim.  See Coast Cities, 912 F. Supp. at 786 ("[T]he [c]ourt has already determined that plaintiff's claims for tortious interference and breach of good faith and fair dealing do not withstand defendants' motions for summary judgment. It follows that they also fail to support [plaintiff's] claim for unfair competition."); Sussex Commons Outlet, LLC v. Chelsea Prop. Grp., 2010 WL 3772543, at *10 (N.J. Super. Ct. App. Div. Sep. 23, 2010) (upholding the trial court's grant of summary judgment on an unfair competition claim because the plaintiff conceded the claim was "grounded on the same facts" as its tortious interference claim, which was also dismissed).

However, Plaintiff's unfair competition claim could also be based on Defendants' alleged misappropriation of its information.  Rest. Techs., Inc. v. Allora, No. 06-cv-05202, 2008 WL 3843527, at *7 (D.N.J. Aug. 15, 2008) ("Misappropriation of confidential information may constitute unfair competition under New Jersey law.").  That is, in theory, even though its tortious interference claim fails, Plaintiff could sustain an unfair competition claim if it could prove that Defendants misappropriated its confidential information.  See Strategic Prods. & Servs., LLC v. Integrated Media Techs., Inc., No. 18-cv-00694, 2019 WL 2067551, at *11 (D.N.J. May 10, 2019)

(declining to dismiss an unfair competition claim where the plaintiff identified an allegation of "culpable conduct" that was distinct from the allegations underlying its tortious interference claim). But, as discussed above, Alpine has not identified any facts indicating that Defendants received and used its confidential information. So, Alpine cannot sustain an unfair competition claim based on a misappropriation theory either.[12]

### 4. Breach of Fiduciary Duty

The Court will also grant summary judgment for Defendants on Plaintiff's breach of fiduciary duty claim. To establish a breach of fiduciary duty under New Jersey law, a plaintiff must show that: "(1) the defendant had a duty to the plaintiff; (2) the duty was breached; (3) injury to the plaintiff occurred as a result of the breach; and (4) the defendant caused that injury." Namerow v. PediatriCare Assocs., LLC, 218 A.3d 839, 846 (N.J. Super. Ct. Ch. Div. 2018). Here, Defendants argue that neither Del Tito nor MAV owed any fiduciary duties to Plaintiff. (Def. Br. at 21). Two persons are in a fiduciary relationship when one of them is "under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Restatement (Second) of Torts § 874, cmt. a (1979). "The essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position." F.G. v. MacDonell, 696 A.2d 697, 703–04 (N.J. 1997).

Defendants are correct that they were not in a fiduciary relationship with Alpine. The parties entered into an ordinary business relationship, which does not give rise to any fiduciary duties. Alexander v. CIGNA Corp., 991 F. Supp. 427, 438 (D.N.J. 1998) ("[F]iduciary duties are not imposed in ordinary commercial business transactions."). Plaintiff emphasizes that it entrusted Defendants with its confidential information and relied on them to act as a liaison. (Pl. Br. at 25).

---

[12] Again, the fact that Plaintiff dropped its misappropriation claim in response to Defendants' motion for sanctions supports the Court's conclusion. (ECF No. 37).

But those responsibilities were imposed by the Agreement.  See Int'l Mins. & Mins. Corp. v. Citicorp N. Am., Inc., 736 F. Supp. 587, 597 (D.N.J. 1990) ("Where a party does not owe another a duty of care absent the existence of a contract, a separate duty of care cannot arise simply by virtue of the existence of the contract.").  Plaintiff does not identify any "facts showing pre-or post-contractual dominance or control by Defendant[s]; [any] facts showing that the [p]arties did not deal at arm's length; [or any] facts showing that the parties entered into something other than an ordinary contractual relationship."  Am. Fin. Res., Inc. v. Countrywide Home Loans Servicing, LP, No. 12-cv-07141, 2013 WL 6816394, at *8 (D.N.J. Dec. 23, 2013).  Thus, Plaintiff's breach of fiduciary duty claim fails.

### 5.  Breach of the Faithless Servant Doctrine

Defendants are entitled to summary judgment on Plaintiff's claim that they breached the faithless servant doctrine.  The faithless servant doctrine states that an agent is not entitled to compensation "for conduct which is disobedient or which [constitutes] a breach of his duty of loyalty."  Restatement (Second) of Agency § 469 (1958).  New Jersey courts apply a duty of loyalty analysis to determine whether one acted as a faithless servant.  All Granite & Marble Corp. v. Deja, No. A-1071-18T1, 2019 WL 7169131, at *3 (N.J. Super. App. Div. Dec. 24, 2019); see also Schweikert v. Baxter Healthcare Corp., No. 12-cv-05876, 2015 WL 4578443, at *23 (D.N.J. Jul. 29, 2015) (determining that the faithless servant doctrine has no basis in New Jersey law because New Jersey courts analyze faithless servant claims under "the breach of duty doctrine").  There are three elements comprising a breach of the duty of loyalty claim under New Jersey law: "(1) the existence of an employer-employee relationship, (2) breach of the duty of loyalty, and (3) resulting harm to the plaintiff."  Canon Fin. Servs., Inc. v. Bray, No. 14-cv-03829, 2015 WL 851816, at *4 (D.N.J. Feb. 26, 2015) (citing Cameco, Inc. v. Gedicke, 724 A.2d 783, 788–90 (N.J. 1999)).

Here, Alpine has not created a genuine issue of material fact regarding its faithless servant claim. As Defendants point out, there is nothing in the record to indicate that either Defendant was employed by Alpine. (Def. Br. at 22–23). Alpine does not dispute this point but instead argues that the faithless servant doctrine also applies beyond strictly employer-employee relationships. (Pl. Br. at 26–27). However, Alpine does not provide any New Jersey law to support this proposition: it only cites cases applying New York law. (Pl. Br. at 26–27) (citing Wechsler v. Bowman, 34 N.E. 2d 322 (N.Y. 1941); Byrne v. Barrett, 197 N.E. 217 (N.Y. 1935); Wendt v. Fischer, 154 N.E. 303 (N.Y. 1926); Kenneth D. Laub & Co. v. Bear Stearns Cos., 718 N.Y.S.2d (N.Y. App. Div. 2000); Sequa Corp. v. GBJ Corp., 156 F.3d 136 (2d Cir. 1998); G.K. Alan Assocs., Inc. v. Lazzari, 840 N.Y.S.2d 378 (N.Y. App. Div. 2007)). Moreover, these cases appear to rely on agency principles and the fiduciary duties inherent in an agency relationship. E.g., G.K. Alan Assocs., 840 N.Y.S.2d at 384 (explaining that although the faithless servant doctrine has been "litigated primarily" in the employment context it is "part of the law of agency"). The Court has already determined that Defendants were not fiduciaries of Alpine. As such, these cases are inapplicable, and the Court will dismiss Plaintiff's breach of the faithless servant doctrine claim.

6. Lanham Act and N.J. Stat. Ann. § 56:4-1

Finally, Plaintiff alleges that Defendants violated Section 43(a) of the Lanham Act. That provision, codified at 15 U.S.C. § 1125(a)(1), creates two distinct bases of liability. Parks LLC v. Tyson Foods, Inc., 863 F.3d 220, 225–26 (3d Cir. 2017). First, § 1125(a)(1)(A) prohibits "false or misleading" claims that are "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of [one] person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A). Claims under this section, often called "false association" claims, have

become "the foremost federal vehicle for the assertion of . . . infringement of even unregistered marks, names, and trade dress . . . ." J. Thomas McCarthy, 5 McCarthy on Trademarks and Unfair Competition § 27:9 (5th ed. 2022) [hereinafter "McCarthy on Trademarks"]. Second, § 1125(a)(1)(B) forbids any false or misleading statement regarding "the nature, characteristics, qualities, or geographic origin of . . . goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). These are called "false advertising" claims. McCarthy on Trademarks § 27:9; see also Parks, 863 F.3d at 226.

Here, Plaintiff does not state whether it is bringing a false association or a false advertising claim. However, it is clear to the Court that Plaintiff cannot sustain a false advertising claim. The Third Circuit has held that false advertising claims may only lie where there is a misrepresentation regarding the characteristics of the good itself. Parks, 863 F.3d at 227. For example, in Parks, the plaintiff alleged that the defendant had engaged in misleading advertising because it had "falsely implied that [defendant's] product is one of [plaintiff's] products." Id. The Court explained that this was not a false advertising claim because "none of [the plaintiff's] grievances concern the nature, characteristics, qualities, or geographic origin" of the goods. Id. at 230 (internal quotation omitted). Similarly, here, Alpine does not allege that Defendants made any misrepresentations regarding the characteristics of the goods but simply contends that Defendants' use of the same SKUs, product descriptions, and labels as Alpine could make customers think they were buying Alpine's products when they were actually buying products sold by a competitor. (Pl. Br. at 27–29). Those facts are insufficient to form the basis of a false advertising claim under § 1125(a)(1)(B).

So, Alpine's Lanham Act claim must be based on false association pursuant to § 1125(a)(1)(A). In order to prove a false association claim, the plaintiff must establish three

elements: (1) the existence of a legally protectable mark, (2) that the mark is owned by the plaintiff, and (3) that the defendant's use of the mark is likely to create confusion regarding the origin of goods or services.  Ford Motor Co. v. Summit Motor Products, Inc., 930 F.2d 277, 291 (3d Cir. 1991).  "Even where those elements are satisfied, relief is limited in scope to where 'market penetration is significant enough to pose the real likelihood of confusion among consumers in that area.'"  Parks, 863 F.3d at 230 (quoting Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc., 921 F.2d 467, 472 (3d Cir. 1990)).

Plaintiff has not created a genuine issue as to whether the "Alpine" name was legally protectable.  For one, Plaintiff does not point to any evidence that "Alpine" was a registered mark. Nor does Plaintiff identify any evidence tending to establish that "Alpine" is distinctive or possesses a secondary meaning.  See Commerce Nat. Ins. Servs., Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 438 (3d Cir. 2000) (explaining that an unregistered mark may still be protectable if it is inherently distinctive or if it has a secondary meaning).  And, even if there was evidence from which a jury could conclude that the "Alpine" mark was protectable, Plaintiff has not provided any evidence from which the Court could determine the market penetration of the mark in order to fashion relief.  Instead, in their briefing, both parties only address the third prong of the false association analysis—the likelihood that consumers would mistake MAV's products for Alpine's.  (Pl. Br. at 27–29; Def. Br. at 23–26).  The failure to establish that "Alpine" was a protectable mark in the first-place dooms Plaintiff's claim.  Therefore, the Court will grant summary judgment for Defendants on Plaintiff's Lanham Act and N.J. Stat. Ann. § 56:4-1 claims.[13]

---

[13] Courts have held that the elements of an N.J. Stat. Ann. § 56:4-1 claim are the same as those required under the Lanham Act.  Adam Techs. LLC v. Well Shin Tech. Co., No. 18-cv-10513, 2020 WL 2125007, at *2 (D.N.J. May, 5, 2020); La Farbil, S.A. v. Mi Tierra Foods, LLC, No. 21-cv-18150, 2021 WL 6010374, at *5 (D.N.J. Dec. 20, 2021). Indeed, here, the parties do not separately discuss Plaintiff's N.J. Stat. Ann. § 56:4-1 claim.  (Pl. Br. at 27–29; Def.

**D.  MAV is Entitled to Summary Judgment on its Counterclaim Related to Commissions Owed by Alpine Under the Agreement**

MAV argues that Alpine must pay it for commissions on sales it made on Alpine's behalf in July and August 2020.  MAV contends it is entitled to the commissions on three separate grounds: (1) the New Jersey Sales Representative Rights Act ("SRRA"); (2) pursuant to the Agreement; and (3) if the Agreement is unenforceable, under equitable doctrines.  (Def. Br. at 26–29).

The Court will grant summary judgment in favor of MAV on its claim that it is owed the commissions pursuant to the Agreement.  Plaintiff admits that it has not paid commissions for the sales made in July and August 2020.  (Def. Br. at 27–28) (citing deposition testimony from Alpine's sales manager in which he admitted that Alpine decided not to pay MAV commissions for July and August sales (Def. Br, Exhibit C, Marchwinski Dep. 64:4-24–65:1-8)).  However, Plaintiff argues that it need not pay the commissions because MAV materially breached the Agreement.  (Pl. Br. at 29–33).  "A material breach by either party to a bilateral contract excuses the other party from rendering any further performance."  RNC Sys., Inc. v. Modern Tech. Grp., Inc., 861 F. Supp. 2d 436, 448 (D.N.J. 2012).  When a party to a contract believes the other party has breached the agreement, "the non-breaching party may either stop performance and assume the contract is avoided, or continue its performance and sue for damages. Under no circumstances may the non-breaching party stop performance and continue to take advantage of the contract's benefits."  Travelodge Hotels, Inc. v. Honeysuckle Enters., Inc., 357 F. Supp. 2d 788, 798 (D.N.J. 2005) (quoting S&R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 375 (3d Cir. 1992)).

---

Br. at 23–26).  As such, because the Court finds insufficient evidence to establish a genuine issue of material fact as to Plaintiff's Lanham Act claim, it finds the same with regard to Plaintiff's claim under N.J. Stat. Ann. § 56:4-1.

Here, despite MAV's alleged material breach, Plaintiff did not terminate the Agreement until September 2020.  (Plaintiff's SUMF ¶¶ 49–51; Defendants' SUMF ¶ 79).  So, in July and August, Plaintiff effectively stopped performing under the Agreement (by not paying the commissions) while still enjoying the contract's advantages in the form of sales MAV procured on its behalf.  Therefore, even if MAV's breach of the Agreement was material, Plaintiff is still obligated under the Agreement to pay the commissions for July and August.[14]

On the other hand, the Court will not grant summary judgment for MAV on its claim that it is entitled to the commissions under the SRRA.  Neither party points to any authority addressing whether or not the contract analysis above also applies to claims under the SRRA.  Nor has the Court identified any authority regarding this issue through its own independent research.  As such, the Court finds there is a genuine issue as to whether MAV is owed the commissions pursuant to the SRRA.

Finally, the parties dispute the amount Alpine owes MAV.  The Agreement specifies that MAV would be paid ten percent of any new sales and six percent of any re-supply orders to existing dealers and distributors.  (Agreement ¶ 4).  Notwithstanding this provision, it appears as if MAV was compensated at a rate of eight percent for sales made through June 2020.  (Def. Br. at 27–28; Def. Br., Exhibit G).  MAV now requests that it be paid at the same eight percent rate for the sales made in July and August 2020 as well.  (Def. Br. at 27–28).  It also argues that it is entitled to payment of damages equal to three times the amount of commissions owed and costs and attorneys' fees under the SRRA.  (Def. Br. at 28) (citing N.J. Stat. Ann. § 2A:61A-3).  Plaintiff, on the other hand, argues that MAV should only be compensated at the six percent rate specified in the contract.  (Pl. Br. at 30).  Moreover, Plaintiff contends it is entitled to (1) offsets for

---

[14] Because the Court concludes that MAV is entitled to the commissions under the Agreement, it need not address MAV's argument that it would also be entitled to the commissions under equitable doctrines.

overpayment it made to MAV during the course of the parties' relationship and (2) refunds for two mistakenly paid commissions based on invoices that were never paid by customers.  (Pl. Br. at 30 n.16 & n.17).  Lastly, the Court notes that, if Plaintiff were to ultimately prevail on its breach of contract claim, any amount it owes MAV would simply be an offset applied to the judgment in favor of Plaintiff.

Given all of this, the Court also finds that there is a material dispute of fact regarding the amount of commissions Plaintiff owes MAV.  Thus, the Court will grant summary judgment for MAV as to its claim that it is owed the commissions under the Agreement but will decline to grant summary judgment as to the amount Plaintiff owes MAV.

## III.   CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion for summary judgment in part and deny it in part and deny Plaintiff's motion for partial summary judgment.   An appropriate Order will be filed with this Opinion.

s/ Stanley R. Chesler
STANLEY R. CHESLER
United States District Judge

Dated: June 3, 2022